1          IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF TEXAS
2                    MARSHALL DIVISION

3

4   NAVICO INC. AND NAVICO        )(    CIVIL DOCKET NO.

5   HOLDING, AS                   )(    2:16-cv-0190

6       VS.                       )(

7                                 )(    MARSHALL, TEXAS

8   GARMIN INTERNATIONAL, INC.    )(    SEPTEMBER 8, 2017

9   AND GARMIN USA, INC.          )(    8:32 A.M.

10

11                 TRANSCRIPT OF JURY TRIAL
             BEFORE THE HONORABLE RODNEY GILSTRAP,
12                UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  FOR THE PLAINTIFFS:

16
    DERON DACUS
17  THE DACUS FIRM, PC
    821 ESE Loop 323, Suite 430
18  Tyler, TX 75701

19
    KIRK T. BRADLEY
20  M. SCOTT STEVENS
    ALSTON & BIRD LLP
21  Bank of America Plaza
    101 South Tryon Street,
22  Suite 4000
    Charlotte, NC 28280-4000
23

24

25

```
 1   FOR THE DEFENDANTS:

 2
     Nicholas Groombridge
 3   PAUL, WEISS, RIFKIND,
         WHARTON & GARRISON LLP
 4   1285 Avenue of the Americas
     New York, NY 10019
 5

 6
     Johnny Ward, Jr.
 7   Texas State Bar No. 00794818
     WARD, SMITH & HILL, PLLC
 8   1507 Bill Owens Parkway
     Longview, TX 75604
 9

10
     David J. Ball
11   PAUL, WEISS, RIFKIND,
         WHARTON & GARRISON LLP
12   2001 K Street, NW
     Washington, DC 20006
13

14
     Jennifer H. Wu
15   PAUL, WEISS, RIFKIND,
         WHARTON & GARRISON LLP
16   1285 Avenue of the Americas
     New York, NY 10019
17

18
     Megan F. Raymond
19   PAUL, WEISS, RIFKIND,
         WHARTON & GARRISON LLP
20   2001 K Street, NW
     Washington, DC 20006
21

22
     David K. Stark
23   PAUL, WEISS, RIFKIND,
         WHARTON & GARRISON LLP
24   2001 K Street, NW
     Washington, DC 20006
25
```

```
 1  Jennifer Deneault
    PAUL, WEISS, RIFKIND,
 2    WHARTON & GARRISON LLP
    1285 Avenue of the Americas
 3  New York, NY 10019

 4

 5  LeeAnn Kim
    PAUL, WEISS, RIFKIND,
 6    WHARTON & GARRISON LLP
    1285 Avenue of the Americas
 7  New York, New York 10019

 8

 9  Megan Raymond
    PAUL, WEISS, RIFKIND,
10    WHARTON & GARRISON LLP
    2001 K Street, NW
11  Washington, DC 20006-1047

12

13

14

15

16  COURT REPORTER:        Shelly Holmes, CSR-TCRR
                           Official Reporter
17                         United States District Court
                           Eastern District of Texas
18                         Marshall Division
                           100 E. Houston Street
19                         Marshall, Texas  75670
                           (903) 923-7464
20

21

22
    (Proceedings recorded by mechanical stenography, transcript
23  produced on a CAT system.)

24

25
```

```
 1                    P R O C E E D I N G S

 2          (Jury out.)

 3          COURT SECURITY OFFICER:  All rise.

 4          THE COURT:  Be seated, please.

 5          All right.  Are the parties ready to read into the

 6  record the items from the list of pre-admitted exhibits used

 7  during yesterday's portion of the trial?

 8          MR. STEVENS:  We are, Your Honor.

 9          THE COURT:  Please proceed.

10          MR. STEVENS:  The exhibits from yesterday are

11  PPX-6, and then PX-16, 60C, 78C, 128C, 168C, 171C, 177C,

12  2258, and 2375.

13          The Defendants' Exhibits are DPX-1, 6, 8, 9, 11,

14  12, 13, and DX-12, 466, 488C, 611C, and 1154.

15          Thank you, Your Honor.

16          THE COURT:  All right.  Does that represent the

17  entire rendition for both parties?

18          MR. STEVENS:  We hope so today, Your Honor.

19          THE COURT:  All right.  Does the Defendant concur

20  with the offer from Mr. Stevens and the Plaintiff?

21          MR. GROOMBRIDGE:  Yes, Your Honor.

22          THE COURT:  All right.  Let me say to those of you

23  present in the courtroom behind the bar, the Court considers

24  its closing -- or excuse me, its final instructions to the

25  jury and counsels' closing arguments to be the most serious
```

```
 1   part of a very serious process.

 2          Therefore, I'm instructing those of you that are in

 3   the gallery not to talk, not to whisper, not to pass notes,

 4   not to get up and shuffle around.

 5          And if you're going to come and go from the

 6   courtroom, please try to do it now.  I'd like as much quiet

 7   and stillness as possible through the presentation of the

 8   charge to the jury and the closing arguments of counsel.

 9          I appreciate your cooperation in this regard.  I

10   just simply want to highlight it and call it to your

11   attention before I bring in the jury.

12          All right.  Do I understand, Mr. Dacus, you'll be

13   presenting argument -- close for Plaintiff?

14          MR. DACUS:  I will, Your Honor.

15          THE COURT:  And, Mr. Groombridge, you're going to

16   argue for Defendant?

17          MR. GROOMBRIDGE:  Yes, Your Honor.

18          THE COURT:  All right.

19          All right.  Then, let's bring in the jury, please.

20          COURT SECURITY OFFICER:  All rise for the jury.

21          (Jury in.)

22          THE COURT:  Good morning, ladies and gentlemen.

23   Please have a seat.

24          Ladies and gentlemen of the jury, you've now heard

25   the evidence in this case.  And I will now instruct you on
```

1    the law that you must apply.

2            Each of you are going to have a complete, written,

3    printed copy of these final jury instructions, so there's

4    really no need for you to make notes on my instructions to

5    you at this time unless you just particularly want to do so.

6            But I want you to be aware you'll each have your

7    own copy of these instructions in written form when you

8    retire to the jury room.

9            It's your duty to follow the law as I give it to

10   you.  On the other hand, and as I've said previously, you,

11   the jury, are the sole judges of the facts in this case.

12           Do not consider any statement that I have made in

13   the course of the trial or may make in these instructions as

14   an indication that I have an opinion about the facts of this

15   case.

16           You're going to hear closing arguments from the

17   attorneys for both of the parties in a few moments.

18           Statements and arguments of the attorneys are not

19   evidence, and they are not instructions on the law.  They're

20   intended only to assist the jury in understanding the

21   evidence and the parties' contentions.

22           A verdict form has been prepared for you.  You'll

23   take this to the jury room.  And when you've reached your

24   unanimous agreement as to the verdict, you'll have your

25   foreperson fill in the blanks reflecting those unanimous

1    answers, sign it, date it, and then return it to the Court

2    Security Officer.

3          After the questions -- excuse me, after you have

4    answered the questions in the verdict form, you should

5    advise the Court Security Officer who will advise the Court.

6          You should answer the questions in the verdict form

7    from the facts as you find them to be.  Do not decide who

8    you think should win the case and then answer the questions

9    to reach that result.  Again, ladies and gentlemen, your

10   answers and your verdict must be unanimous.

11         In determining whether any fact has been proven in

12   this case, you may, unless otherwise instructed, consider

13   the testimony of all the witnesses regardless of who may

14   have called them, and you may consider all the exhibits

15   received and admitted into evidence, regardless of who may

16   have introduced them.

17         You, the jurors, are the sole judges of the

18   credibility of all the witnesses and the weight and effect

19   to give to all of the evidence.

20         By allowing the testimony or other evidence to be

21   introduced over the objection of an attorney, the Court did

22   not indicate an opinion as to the weight or effect of such

23   evidence.

24         As I've told you previously, the attorneys in this

25   case are advocates for their competing clients and have a

1  duty to object when they believe evidence is offered that

2  should not be admitted under the rules of the Court.

3         When the Court sustained an objection to a question

4  addressed to a witness, you must disregard that question

5  entirely; and you may draw no inference from its wording or

6  speculate about what the witness would have said if he or

7  she had been permitted to answer the question.

8         If an objection was overruled, then you should

9  treat the answer to the question just as if you would treat

10 the answer to any other question as though the objection had

11 not been made.

12        Now, at times during the course of the trial, it's

13 been necessary for the Court to talk to the lawyers here at

14 the bench and outside of your hearing or by calling a recess

15 and talking to them while you were outside the courtroom.

16        This happens often during a trial because there are

17 things that sometimes come up that do not involve the jury.

18 You should not speculate about what was said during --

19 during such discussions that took place outside your

20 presence.

21        There are two types of evidence that you may

22 consider in properly finding the truth as to the facts in

23 this case.

24        One is direct evidence, such as the testimony of an

25 eyewitness.

1          The other is indirect or circumstantial evidence --

2     that is, the proof of a chain of circumstances that

3     indicates the existence or non-existence of certain other

4     facts.

5          As a general rule, ladies and gentlemen, the law

6     makes no distinction between direct and circumstantial

7     evidence, but simply requires that you find the facts based

8     on the evidence presented, both direct and circumstantial.

9          The parties may have stipulated or agreed to some

10    facts in the case.  When the lawyers for both sides

11    stipulate as to the existence of a fact, you must, unless

12    otherwise instructed, accept the stipulation as evidence and

13    regard those facts as proven.

14         Certain testimony in this case has been presented

15    to you through depositions.  A deposition is the sworn,

16    recorded answers to questions asked to a witness in advance

17    of the trial.

18         If a witness cannot be present to testify in person

19    from the witness stand, the witness's testimony may be

20    presented under oath in the form of a deposition.

21         Before the trial, attorneys representing both

22    parties in the case questioned these deposition witnesses

23    under oath.

24         A court reporter was present and recorded the

25    testimony.  Deposition testimony is entitled to the same

1  consideration as testimony given by a witness in person from

2  the witness stand in open court.

3        Accordingly, ladies and gentlemen, you should

4  determine the credibility and importance of deposition

5  testimony to the best of your ability just as if the witness

6  had testified live before you in open court.

7        While you should consider only the evidence in this

8  case, you are permitted to draw such reasonable inferences

9  from the testimony and exhibits as you feel are justified in

10  the light of common experience.

11        In other words, ladies and gentlemen, you may make

12  deductions and reach conclusions that reason and common

13  sense lead you to draw from the facts that have been

14  established by the testimony and evidence in this case.

15        However, you should not base your decision on any

16  evidence not presented by the parties during the case,

17  including your own personal experiences with any particular

18  product or device.

19        Unless I instruct you otherwise, you may properly

20  determine the testimony -- that the testimony of a single

21  witness may be sufficient to prove any fact, even if a

22  greater number of witnesses may have testified to the

23  contrary, if after considering all the evidence you believe

24  that single witness.

25        Now, when knowledge of a technical subject matter

might be helpful to the jury, a person who has special

training or experience in that technical field, called an

expert witness, is permitted to state his or her opinions on

those technical matters.

However, ladies and gentlemen, you're not required

to accept those opinions.  As with any other witness, it's

solely up to you to decide whether to rely upon it or not.

Certain exhibits have been shown to you during the

course of the trial as illustrations.  We call these types

of exhibits demonstrative exhibits or simply demonstratives

for short.

Demonstrative exhibits are a party's description,

picture, or model to describe something involved in the

trial.

If your recollection of the evidence differs from

the demonstratives, you should rely on your recollection.

Demonstrative -- demonstrative exhibits are sometimes called

jury aids.

And demonstrative exhibits themselves are not

evidence, but a witness's testimony concerning a

demonstrative exhibit is evidence.

In any legal action, facts must be proved by a

required amount of evidence known as the burden of proof.

The burden of proof in this case is on the Plaintiff for

some issues and on the Defendant for other issues.

1            There are two burdens of proof that you will apply

2    in this case, the preponderance of the evidence and clear

3    and convincing evidence.

4            The Plaintiff, Navico, has the burden of proving

5    patent infringement by a preponderance of the evidence.  The

6    Plaintiff, Navico, has the burden of proving willful patent

7    infringement by a preponderance of the evidence.

8            The Plaintiff also has the burden of proving

9    damages for patent infringement by a preponderance of the

10   evidence.

11           A preponderance of the evidence means evidence that

12   persuades you that a claim is more probably true than not

13   true.  Sometimes this is talked about as being the greater

14   weight and degree of credible testimony.

15           The Defendant, Garmin, has the burden of proving

16   patent invalidity by clear and convincing evidence.

17           Clear and convincing evidence means evidence that

18   produces in your mind an abiding conviction that the truth

19   of the party's factual contentions are highly probable.

20           Although proof to an absolute certainty is not

21   required, the clear and convincing evidence standard

22   requires a greater degree of persuasion than is necessary

23   for the preponderance of the evidence standard.

24           If proof establishes in your mind an abiding

25   conviction in the truth of the matter, then the clear and

1    convincing standard has been met.

2            You're going to hear closing arguments from the

3    attorneys for both of the parties in a few moments.

4            Statements and arguments of the attorneys are not

5    evidence, and they are not instructions on the law.  They're

6    intended only to assist the jury in understanding the

7    evidence and the parties' contentions.

8            A verdict form has been prepared for you.  You'll

9    take this to the jury room.  And when you've reached your

10   unanimous agreement as to the verdict, you'll have your

11   foreperson fill in the blanks reflecting those unanimous

12   answers, sign it, date it, and then return it to the Court

13   Security Officer.

14           After the questions -- excuse me, after you have

15   answered the questions in the verdict form, you should

16   advise the Court Security Officer who will advise the Court.

17           You should answer the questions in the verdict form

18   from the facts as you find them to be.  Do not decide who

19   you think should win the case and then answer the questions

20   to reach that result.  Again, ladies and gentlemen, your

21   answers and your verdict must be unanimous.

22           In determining whether any fact has been proven in

23   this case, you may, unless otherwise instructed, consider

24   the testimony of all the witnesses regardless of who may

25   have called them, and you may consider all the exhibits

received and admitted into evidence, regardless of who may
have introduced them.

You, the jurors, are the sole judges of the
credibility of all the witnesses and the weight and effect
to give to all of the evidence.

By allowing the testimony or other evidence to be
introduced over the objection of an attorney, the Court did
not indicate an opinion as to the weight or effect of such
evidence.

As I've told you previously, the attorneys in this
case are advocates for their competing clients and have a
duty to object when they believe evidence is offered that
should not be admitted under the rules of the Court.

When the Court sustained an objection to a question
addressed to a witness, you must disregard that question
entirely; and you may draw no inference from its wording or
speculate about what the witness would have said if he or
she had been permitted to answer the question.

If an objection was overruled, then you should
treat the answer to the question just as if you would treat
the answer to any other question as though the objection had
not been made.

Now, at times during the course of the trial, it's
been necessary for the Court to talk to the lawyers here at
the bench and outside of your hearing or by calling a recess

1    and talking to them while you were outside the courtroom.

2            This happens often during a trial because there are

3    things that sometimes come up that do not involve the jury.

4    You should not speculate about what was said during --

5    during such discussions that took place outside your

6    presence.

7            There are two types of evidence that you may

8    consider in properly finding the truth as to the facts in

9    this case.

10           One is direct evidence, such as the testimony of an

11   eyewitness.

12           The other is indirect or circumstantial evidence --

13   that is, the proof of a chain of circumstances that

14   indicates the existence or non-existence of certain other

15   facts.

16           As a general rule, ladies and gentlemen, the law

17   makes no distinction between direct and circumstantial

18   evidence, but simply requires that you find the facts based

19   on the evidence presented, both direct and circumstantial.

20           The parties may have stipulated or agreed to some

21   facts in the case.  When the lawyers for both sides

22   stipulate as to the existence of a fact, you must, unless

23   otherwise instructed, accept the stipulation as evidence and

24   regard those facts as proven.

25           Certain testimony in this case has been presented

1    to you through depositions.  A deposition is the sworn,

2    recorded answers to questions asked to a witness in advance

3    of the trial.

4           If a witness cannot be present to testify in person

5    from the witness stand, the witness's testimony may be

6    presented under oath in the form of a deposition.

7           Before the trial, attorneys representing both

8    parties in the case questioned these deposition witnesses

9    under oath.

10          A court reporter was present and recorded the

11   testimony.  Deposition testimony is entitled to the same

12   consideration as testimony given by a witness in person from

13   the witness stand in open court.

14          Accordingly, ladies and gentlemen, you should

15   determine the credibility and importance of deposition

16   testimony to the best of your ability just as if the witness

17   had testified live before you in open court.

18          While you should consider only the evidence in this

19   case, you are permitted to draw such reasonable inferences

20   from the testimony and exhibits as you feel are justified in

21   the light of common experience.

22          In other words, ladies and gentlemen, you may make

23   deductions and reach conclusions that reason and common

24   sense lead you to draw from the facts that have been

25   established by the testimony and evidence in this case.

1          However, you should not base your decision on any

2    evidence not presented by the parties during the case,

3    including your own personal experiences with any particular

4    product or device.

5          Unless I instruct you otherwise, you may properly

6    determine the testimony -- that the testimony of a single

7    witness may be sufficient to prove any fact, even if a

8    greater number of witnesses may have testified to the

9    contrary, if after considering all the evidence you believe

10   that single witness.

11         Now, when knowledge of a technical subject matter

12   might be helpful to the jury, a person who has special

13   training or experience in that technical field, called an

14   expert witness, is permitted to state his or her opinions on

15   those technical matters.

16         However, ladies and gentlemen, you're not required

17   to accept those opinions.  As with any other witness, it's

18   solely up to you to decide whether to rely upon it or not.

19         Certain exhibits have been shown to you during the

20   course of the trial as illustrations.  We call these types

21   of exhibits demonstrative exhibits or simply demonstratives

22   for short.

23         Demonstrative exhibits are a party's description,

24   picture, or model to describe something involved in the

25   trial.

If your recollection of the evidence differs from the demonstratives, you should rely on your recollection. Demonstrative -- demonstrative exhibits are sometimes called jury aids.

And demonstrative exhibits themselves are not evidence, but a witness's testimony concerning a demonstrative exhibit is evidence.

In any legal action, facts must be proved by a required amount of evidence known as the burden of proof. The burden of proof in this case is on the Plaintiff for some issues and on the Defendant for other issues.

There are two burdens of proof that you will apply in this case, the preponderance of the evidence and clear and convincing evidence.

The Plaintiff, Navico, has the burden of proving patent infringement by a preponderance of the evidence.  The Plaintiff, Navico, has the burden of proving willful patent infringement by a preponderance of the evidence.

The Plaintiff also has the burden of proving damages for patent infringement by a preponderance of the evidence.

A preponderance of the evidence means evidence that persuades you that a claim is more probably true than not true.  Sometimes this is talked about as being the greater weight and degree of credible testimony.

1    The Defendant, Garmin, has the burden of proving

2  patent invalidity by clear and convincing evidence.

3    Clear and convincing evidence means evidence that

4  produces in your mind an abiding conviction that the truth

5  of the party's factual contentions are highly probable.

6    Although proof to an absolute certainty is not

7  required, the clear and convincing evidence standard

8  requires a greater degree of persuasion than is necessary

9  for the preponderance of the evidence standard.

10    If proof establishes in your mind an abiding

11  conviction in the truth of the matter, then the clear and

12  convincing standard has been met.

13    These standards are different from what you may

14  have heard about in criminal proceedings where a fact

15  must be proven beyond a reasonable doubt.

16    On a scale of these various standards of proof, as

17  you move from preponderance of the evidence, where proof may

18  need only be sufficient to tip the scales in favor of the

19  party to prove the fact beyond a reasonable doubt, at the

20  other end of the spectrum, where a fact must be proven to a

21  very, very high degree of certainty, you may think of clear

22  and convincing evidence as being between those two points on

23  the spectrum.

24    In determining whether any fact has been proved by

25  a preponderance of the evidence or by clear and convincing

```
 1   evidence, you may, unless otherwise instructed, consider the
 2   stipulations between the parties, the testimony of all the
 3   witnesses, regard -- regardless of who called them, and all
 4   the exhibits received into evidence, regardless of who may
 5   have produced them.
 6          Now, as I did at the start of the case, I'll first
 7   give you a summary of each side's contentions in the case.
 8   I'll then provide you with detailed instructions on what
 9   each side must prove to win on each of its contentions.
10          As I've previously told you, this case concerns two
11   United States patents, and they are U.S. Patent No.
12   9,223,002 (sic), which you've heard referred to throughout
13   the trial simply as the '002 (sic) patent, and United States
14   Patent 9,244,168, which you've heard referred to throughout
15   the trial as the '168 patent.  I'll refer to both of these
16   patents as the patents-in-suit or the asserted patents.
17          The Plaintiff, Navico, seeks money damages from the
18   Defendant, Garmin, for allegedly infringing the
19   patents-in-suit by making, using, selling, or offering for
20   sale in the United States certain DownVu, below the water,
21   fishfinding devices.  These devices have been presented to
22   you throughout the trial as the accused products.
23          The Plaintiff contends that these accused products
24   infringe the following claims of the patents-in-suit:  With
25   regard to the '022 patent, the asserted claims are Claims 1,
```

1    35, 36, 37, 48, 53, 54, 56, 59, 61, 66, and 67.

2         With regard to the '168 patent, the asserted claims

3    are Claims 1, Claim 8, 10, 12, 13, and 18.

4         All of these claims are referred to as --

5    collectively as the asserted claims.

6         And the Plaintiff has alleged that the accused

7    products infringe these asserted claims either literally or

8    through the Doctrine of Equivalents.

9         Plaintiff also alleges that the Defendants'

10   infringement is and has been willful.  The Plaintiff,

11   Navico, seeks lost profits and a reasonable royalty from the

12   Defendant, Garmin, with regard to this alleged infringement.

13        The Defendant, Garmin, denies that the accused

14   products infringe any of the asserted claims of either the

15   '022 or the '168 patent either literally or through the

16   Doctrine of Equivalents.

17        And Defendant, Garmin, denies that any infringement

18   exists; and if it does exist, they deny that it has been

19   willful.

20        Now, the Defendant, Garmin, also contends that the

21   asserted claims of Navico's patents, the patents-in-suit,

22   are invalid.

23        Garmin contends that the asserted claims are

24   obvious in light of prior art that existed before the

25   inventions represented by the patents-in-suit.  And the

1    Defendant also asserts that certain of the claims of the

2    asserted patents are invalid as being anticipated by the

3    prior art.

4        Garmin also denies that it owes Navico any damages.

5        Invalidity and infringement, ladies and gentlemen,

6    are separate and distinct issues.  Your job is to decide

7    whether the asserted claims of the asserted patents have

8    been infringed and whether any of the asserted claims of the

9    patents-in-suit are invalid.

10        If you decide that any claim of an asserted patent

11    has been infringed and is not invalid, then you'll need to

12    decide whether the Defendants' infringement has been willful

13    and the amount of money damages to be awarded to the

14    Plaintiff as compensation for that infringement.

15        Before you can decide many of the issues in this

16    case, you'll need to understand the role of the patent

17    claims.

18        The patent claims are the numbered sentences at the

19    end of the patent.  The claims are important because it is

20    the words of the claims themselves that define what a patent

21    covers.

22        The figures and the text in the rest of the patent

23    provide a description and/or examples of the invention and

24    provide context for the claims.  But it is the claims that

25    define the breadth of the patent's coverage.

1          Each claim is effectively treated as if it were a

2    separate patent, and each claim may cover more or less than

3    any other claim.  Therefore, what a patent covers

4    collectively depends on what each of its claims covers.

5          Claims may describe apparatuses, devices, or

6    products such as machines.  I will call such claims

7    apparatus claims.  Claims may also describe methods for

8    using a product.  I'll call those claims method claims.

9          Ladies and gentlemen, I need to ask you to take a

10   short recess before I give you the rest of my final jury

11   instructions.  I'm going to ask you to retire to the jury

12   room very briefly.

13         You may leave your juror notebooks in your chairs.

14   I hope to have you out of the room for just a few minutes.

15         I will make it as short as possible, but I'll

16   return you -- or have you return to the courtroom in just a

17   few minutes, and I'll continue with these final jury

18   instructions at that time.

19         You should follow all my instructions that I've

20   previously given you while you are outside the courtroom,

21   especially including not to discuss the case in any way

22   whatsoever.

23         At this time, the jury may proceed to the jury

24   room.

25         COURT SECURITY OFFICER:  All rise for the jury.

1          (Jury out.)

2          THE COURT:  The Court's going to take a brief

3    recess.  Let me see lead and local counsel in chambers

4    briefly.

5          COURT SECURITY OFFICER:  All rise.

6          (Recess.)

7          COURT SECURITY OFFICER:  All rise.

8          THE COURT:  Please be seated.

9          Let's bring in the jury, please, Mr. Johnston.

10          COURT SECURITY OFFICER:  All rise for the jury.

11          (Jury in.)

12          THE COURT:  Please be seated, ladies and gentlemen.

13          I apologize for that brief interruption.  We'll

14    continue now with my final instructions to the jury.

15          As I told you, before you can decide any of the

16    issues in the case, you'll need to understand the role of

17    the patent claims.  The patent claims are the numbered

18    sentences at the end of each patent.

19          The claims are important because it's the words of

20    the claims that define what a patent covers.  The figures in

21    the text, as I've told you, provide a description or

22    examples of the invention and a context for the claims, but

23    it is the claims themselves that define the breadth of the

24    patent's coverage.

25          Each claim is effectively treated as if it were a

separate patent, and each claim may cover more or less than any other claim.  Therefore, what a patent covers depends in turn on what each of its claims covers.

You'll first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.

The law says it's my role to define the terms of the claim, and it's your role to apply my definitions to the issues that you are asked to decide in this case.

Therefore, as I explained to you, at the start of the case, I've already determined the meaning of certain claim limitations or terms, and I'll provide you with those meanings.

Additionally, those meanings are set forth particularly in your juror notebooks which you've had throughout the trial and which you'll have throughout your deliberations.

You must accept my definitions of these words in the claims as being correct.  It's your job to take these definitions and apply them to the issues that you're asked to decide, including the issues of infringement and validity.

You should disregard any evidence presented at trial which contradicts or is inconsistent with the

1    constructions and definitions that I have given you.

2         For claim limitations that I have not construed,

3    that is, interpreted or defined, you're to use the plain and

4    ordinary meaning of those terms as understood by one of

5    ordinary skill in the art, which is to say in the field of

6    technology of the patent at the time of the alleged

7    invention.

8         The meaning of the words of the patent claims must

9    be the same when deciding both infringement and validity.

10        You've been -- you've been provided with copies of

11   the asserted patents which have been placed inside your

12   juror notebooks, and you may use those throughout your

13   deliberations.

14        Again, ladies and gentlemen, the patents-in-suit

15   are the '022 patent, I think I may have said '002 earlier;

16   but for any doubt, it's the '022 patent, and the '168

17   patent.  Those are the asserted patents or the

18   patents-in-suit.

19        I'll now explain to you how a claim defines what it

20   covers.

21        A claim sets forth in words a set of requirements.

22   Each claim sets forth its requirements in a single sentence.

23   If a device satisfies each of these requirements in that

24   sentence, then it is covered by and infringes the claim.

25        There can be several claims in a patent.  A claim

1    may be narrower or broader than another claim by setting

2    forth more or fewer requirements.  The coverage of a patent

3    is assessed on a claim-by-claim basis.

4           The requirements of a claim are often referred to

5    as claim elements or claim limitations.  When a product

6    meets all the requirements of a claim, the claim is said to

7    cover that product, and the product is said to fall within

8    the scope of that claim.

9           In other words, a claim covers a product where each

10   of the claim elements or limitation -- limitations is

11   present in the product.

12          If a product is missing even one limitation or

13   element of a claim, the product is not covered by the claim.

14   If a product is not covered by the claim, that product does

15   not infringe that claim.

16          Patent claims exist in two forms, referred to as

17   independent claims and dependent claims.

18          An independent claim does not refer to any other

19   claim of the patent.  It stands alone.  An independent claim

20   sets forth all the requirements that must be met in order to

21   be covered by that claim.

22          Thus, it's not necessary to look to any other claim

23   to determine what an independent claim covers.  In this

24   case, Claims 1 and 35 of the '022 patent and Claims 1 and 13

25   of the '168 patent are each independent claims.

1        A dependent claim, on the other hand, does not
2   itself recite all the requirements of the claim but refers
3   to another claim or claims or some of its requirements.  In
4   this way, the claim depends on another claim.

5        A dependent claim incorporates all the requirement
6   of the claim or claims to which it refers, and it adds its
7   own additional requirements.

8        To determine what a dependent claim covers, it's
9   necessary to look at both the dependent claim and any other
10  claim or claims to which it refers.

11       Now, a product that meets all the requirements of
12  both the dependent claim and the claim or claims to which it
13  refers is covered by that dependent claim.

14       I'll now explain the meaning to you of some of the
15  words of the claims in this case.  In doing so, I will
16  explain some of the requirements of the claims.

17       As I've previously instructed you, you must accept
18  my definitions of these words in claims as correct.  For any
19  words in the claim for which I did not provide you with a
20  definition, you should apply their plain and ordinary
21  meaning.

22       You should not take my definition of the language
23  of the claims as an indication that I have a view regarding
24  how you should decide the issues that you are asked to
25  decide in this case, including infringement and invalidity.

1    Those issues are yours alone to decide.

2         The term "downscan" in the '022 patent means

3    "downwardly pointed."

4         The term downscan trans -- transducer element in

5    the '022 patent means "downwardly pointed transducer that is

6    formed from a single crystal or a plurality of crystals that

7    act simultaneously and in phase as if they were a single

8    crystal."

9         The term "transducer element" in the '168 patent

10   means "transducer that is formed from a single crystal or a

11   plurality of crystals that acts simultaneously and in phase

12   as if they were a single crystal."

13        I'll now instruct you on how to decide whether or

14   not Garmin has infringed the '022 and the '168 patents.

15        Infringement, ladies and gentlemen, is assessed on

16   a claim-by-claim basis.  Therefore, there may be

17   infringement as to one claim but no infringement as to

18   another claim.

19        In this case, there are three possible ways that a

20   claim may be infringed.  The three types of infringement are

21   called direct infringement, active inducement, and

22   contributory infringement.

23        Active inducement and contributory infringement are

24   referred to as indirect infringement.  There cannot be

25   indirect infringement without someone else engaging in

1    direct infringement.

2            To prove indirect infringement, the Plaintiff,

3    Navico, must prove that the Defendant, Garmin's, indirect

4    infringement caused direct infringement.

5            In this case, Navico alleges that Garmin both

6    directly and indirectly infringes the '022 and the '168

7    patents.

8            Navico's allegations of indirect infringement

9    concern both active inducement and contributory neg --

10   infringement, with Navico contending that Garmin's indirect

11   infringement leads to direct infringement by Garmin's

12   customers.

13           In order to prove infringement, Navico must prove

14   that the requirements for one or more of these types of

15   infringement are met by a preponderance of the evidence;

16   that is, that it is more likely than not that all the

17   requirements for one or more of each of these types of

18   infringement have been proved.

19           I'll now explain each of these types of

20   infringement in more detail.

21           A patent owner has the right to prevent others from

22   using the invention covered by its patent claims in the

23   United States during the life of the patent.

24           If any person makes, uses, sells, or offers to sell

25   within the United States or imports into the United States

what is covered by the patent claims without the patent owner's permission, that person is said to infringe the patent.

In reaching your decision on infringement, keep in mind that only the claims of a patent can be infringed. You must compare the asserted claims as I have defined each of them to the accused product and determine whether or not there is infringement.

You should not compare the accused product with any specific example set out in the patent or with Navico's commercial products or with the prior art in reaching your decision on infringement.

The only correct comparison is between the accused product and the language of the claims themselves as the Court has construed them or as the parties have agreed to their meaning.

You must reach your decision as to each assertion of infringement based on my instructions about the meaning and scope of the claims, the legal requirements for infringement, and the evidence presented to you by the parties during the trial.

I'll now instruct you on the specific rules you must follow to determine whether Navico has proven that Garmin has infringed one or more of the patent claims involved in this case.

1      In order to prove direct infringement of a patent

2 claim, Navico must show by a preponderance of the evidence

3 that the accused product includes each and every requirement

4 or limitation of the claim either literally or under the

5 Doctrine of Equivalents.

6      In determining whether an accused product directly

7 infringes a patent claim in this case, you must compare the

8 accused product with every one of the requirements or

9 limitations of that claim to determine whether the accused

10 product contains every requirement or limitation recited in

11 the claim.

12      A claim requirement is literally present if it

13 exists in an accused product just as it is described in the

14 claim language, either as I have explained the language to

15 you; or if I did not explain it, as it would be understood

16 by its plain and ordinary meaning to one of skill in the

17 art.

18      A patent can be directly infringed even if the

19 alleged infringer did not have knowledge of the patent and

20 without the infringer knowing that what it was doing is

21 infringement of the claim.

22      A patent may also be directly infringed even though

23 the accused infringer believes in good faith that what it is

24 doing is not infringement of the patent.

25      Now, you must determine separately for each

asserted claim whether or not there is infringement.  There
is one exception to this rule.

       If you find that a claim on which other claims
depend is not infringed, there cannot be infringement of any
dependent claim that refers directly or indirectly to that
independent claim.

       On the other hand, if you find that an independent
claim has been infringed, you must still decide, separately,
whether the product meets the additional requirements of any
claims that depend from the independent claim, thus whether
those claims have also been infringed.

       A dependent claim includes all requirements of any
of the claims to which it refers, plus additional
requirements of its own.

       If a person makes, uses, sells, or offers to sell
within the United States a product which does not meet all
the requirements of a claim and thus does not literally
infringe the claim, there can still be direct infringement
if that product satisfies that claim under the Doctrine of
Equivalents.

       Under the Doctrine of Equivalents, a product
infringes a claim if the accused product performs steps or
contains elements corresponding to each and every
requirement of the claim that is equivalent to, even though
not literally met -- met by the accused product.

1          You may find that a step or element is equivalent

2     to a requirement of a claim that is not literally met if a

3     person having ordinary skill in the field of technology of

4     the patent would have considered the differences between

5     them to be insubstantial or would have found that the action

6     or structure performs substantially the same function in

7     substantially the same way to achieve substantially the same

8     result as the requirement of the claim.

9          In order for the structure or action to be

10    considered interchangeable, the structure or action must

11    have been known at the time of the alleged infringement to a

12    person having ordinary skill in the field of technology of

13    the patent.  Interchangeability at the present time is not

14    sufficient.

15         In order to prove infringement by equivalents,

16    Plaintiff, Navico, must prove the equivalency of each

17    element by a preponderance of the evidence.

18         Navico alleges that Garmin is liable for indirect

19    infringement by actively inducing its customers to directly

20    infringe the '022 or the '168 patents literally or under the

21    Doctrine of Equivalents.  As with direct infringement, you

22    must determine whether there has been active inducement on a

23    claim-by-claim basis.

24         Garmin is liable for active inducement of a claim

25    if Navico proves by a preponderance of the evidence:

1              (1) that the acts are actually carried out by

2   Garmin's retailers or customers and directly infringe that

3   claim.

4              (2) that Garmin took action intending to cause the

5   infringing acts by its retailers and customers.

6              And, (3), that Garmin was aware of or willfully

7   blind to the patent and knew that the acts, if taken, would

8   constitute infringement of the patent, or that Garmin was

9   willfully blind to that infringement.

10             If you find that Garmin was aware of the patent but

11  believed that the acts it encouraged did not infringe the

12  asserted patent, Garmin cannot be liable for inducement.

13             In order to establish active inducement of

14  infringement, it is not sufficient that Garmin's customers

15  directly infringe the claim; nor is it sufficient that

16  Garmin was aware of the acts by Garmin's customers that

17  allegedly constitute direct infringement.

18             Rather, in order to find active inducement of

19  infringement, you must find either that Garmin specifically

20  intended its customers to infringe the '022 or the '168

21  patents or that Garmin believed there was a high probability

22  of infringing -- high probability that Garmin's customers

23  would infringe the '022 and the '168 patents but

24  deliberately avoided learning the infringing nature of the

25  customers' acts.

1        The mere fact, if true, that Garmin knew or should

2   have known that there was a substantial risk that its

3   customers' acts would infringe either the '022 patent or the

4   '168 patent would not be sufficient for active inducement of

5   infringement.

6        Navico must prove induced infringement by a

7   preponderance of the evidence.

8        Navico alleges that Garmin is liable for

9   contributory infringement by contributing to the direct

10  infringement of the '022 and the '168 patents by Garmin's

11  customers.

12       As with direct infringement, ladies and gentlemen,

13  you must determine contributory infringement on a

14  claim-by-claim basis.

15       Garmin is liable for contributory infringement of a

16  claim if Navico proves by a preponderance of the evidence:

17       (1) Garmin sells, offers to sell, or imports into

18  the United States a component of a product or apparatus for

19  use in a product (sic) during the time the '022 or the '168

20  patents were in force.

21       (2) the component or apparatus has no substantial

22  non-infringing use.

23       (3) the component or apparatus constitutes a

24  material part of the invention.

25       (4) Garmin was aware of the '022 or the '168 patent

1  and knew that the products or processes for which the

2  component has no other substantial use may be covered by a

3  claim of the '022 or the '168 patents or may satisfy a claim

4  of the same patent under the Doctrine of Equivalents.

5          And, (5), that use directly infringes the claim.

6          In order to prove contributory infringement, Navico

7  must prove that each of the above requirements is met by a

8  preponderance of the evidence.

9          In this case, Navico also contends that Garmin has

10 willfully infringed Navico's patents.  If you have decided

11 that Garmin has infringed, you must go on and address the

12 additional issue of whether or not this infringement is

13 willful.

14         If you decide that infringement was willful, that

15 decision should not affect any damages award that you might

16 make.  I will take willfulness into account later.

17         In order to show that infringement was willful,

18 Navico must persuade you that it is more likely than not

19 that Garmin had knowledge of the patents and that its

20 conduct was egregious, reckless, wanton, malicious, done in

21 bad faith, deliberately or consciously wrongful or flagrant.

22         You may not determine that infringement was willful

23 just because Garmin knew of the asserted patents and

24 infringed them.

25         Instead, willful infringement is reserved for cases

1    where the infringement is egregious, reckless, or done in

2    bad faith.

3         Your determination of willfulness should

4    incorporate the totality of the circumstances based on the

5    evidence presented during the trial.

6         If you decide that any infringement was willful,

7    that decision, as I've told you, should not affect any

8    damage -- any damage award that you would make in this case.

9    I will take willfulness into account later.

10         Navico must prove willfulness by a preponderance of

11    the evidence.

12         I'll now instruct you on the rules you must follow

13    in deciding whether or not Garmin has proven that the

14    asserted claims of the '022 or the '168 patent are invalid.

15         An issued United States patent is accorded a

16    presumption of validity based on the presumption that the

17    United States Patent and Trademark Office, which you've

18    often heard referred to throughout this trial as the Patent

19    Office or the PTO, acted correctly in issuing the patent.

20    This presumption of validity extends to all issued United

21    States patents.

22         To prove that any claim of a patent is invalid,

23    the Defendant, Garmin, must persuade you by clear and

24    convincing evidence that the claim is invalid.

25         Like infringement, ladies and gentlemen, invalidity

1  is determined on a claim-by-claim basis.  You must determine

2  separately for each claim whether that claim is invalid.

3  Claims are construed in the same way for determining

4  infringement as for determining invalidity.

5       You must apply the claim language consistently and

6  in the same manner for the issues of infringement and for

7  the issues of invalidity.

8       In -- in making your determination as to

9  invalidity, you should consider each claim separately.

10      Prior art may include items that were publicly

11  known or that have been used or offered for sale, or

12  references such as publications or patents that disclose the

13  claimed invention or elements of the claimed invention.

14      To be prior art, the item or reference must have

15  been made, known, used, published, or patented either before

16  the invention was made or more than -- or more than one year

17  before the filing date of the patent application, which is

18  July the 14th, 2009 for the '022 patent and January the 30th

19  the 2013 for the '168 patent.

20      However, prior art does not include a publication

21  by the inventor that describes the inventor's own work and

22  was published less than one year before the date of the

23  invention.

24      For the claim to be invalid because it is not new,

25  Garmin must show by clear and convincing evidence that all

of the requirements of the claim were present in a single previously -- previous device or method that was known of, used, or described in a single previous printed publication or patent.  We call these things anticipating prior art.

To anticipate the invention, the prior art does not have to use the same words as the claim, but all the requirements of the claim must have been disclosed either stated expressly or implied to a person of ordinary skill in the art in the technology of the invention so that looking at that one reference, that person could make and use the claimed invention.

In order for someone to be entitled to a patent, the invention must actually be new, and the inventor must not have lost his or her rights by delaying the filing of an application claiming the invention.

In general, inventions are new when the identical apparatus, system, or method has not been made, used, or disclosed before.  Anticipation, ladies and gentlemen, must determined on a claim-by-claim basis.

In this case, Garmin contends that Claims 1, 35, 36, 37, 56, 59, 66, and 67 of the '022 patent, but no claims of the '168 patent, are invalid because the claimed inventions are anticipated.

Garmin must convince you of this by clear and convincing evidence.

1        Prior art differing from the prior art considered

2   by the Patent Office may, but does not always, carry more

3   weight than the prior art that was considered by the Patent

4   Office.

5        Even though an invention may not have been

6   identically disclosed or described in a single prior art

7   reference before it was made by an inventor, the invention

8   may have been obvious to a person of ordinary skill in the

9   field of technology of the patent at the time the invention

10  was made.

11       Garmin may establish that a patent claim is invalid

12  by showing by clear and convincing evidence that the claimed

13  invention would have been obvious to persons having ordinary

14  skill in the art at the time the invention was made in the

15  field of sonar.

16       In determining whether a claimed invention was

17  obvious, you must consider the level of ordinary skill in

18  the field of technology of the patent that someone would

19  have had at the time the claimed invention was made, the

20  scope and content of the prior art, any differences between

21  the prior art and the claimed invention, as well as the

22  ordinary knowledge of the person of ordinary skill at the

23  time of the invention.

24       Keep in mind, ladies and gentlemen, that the

25  existence of each and every element of the claimed invention

in the prior art does not necessarily prove obviousness.
Most, if not all, inventions rely on the building blocks of
prior art.

Now, in considering whether a claimed invention is
obvious, you should consider whether there was a reason that
would have prompted a person of ordinary skill in the field
to combine the known elements in a way that the claimed
invention does, taking into account such facts as:

(1) whether the claimed invention was merely the
predictable result of using prior art elements according to
their known function;

(2) whether the claimed invention provides an
obvious solution to a known problem in the relevant field;

(3) whether the prior art teaches or suggests the
desirability of combining elements in the manner of the
claimed inventions;

(4) whether the prior art teaches away from
combining elements in the manner of the claimed invention;

(5) whether it would have been obvious to try the
combination of elements in the claimed invention, such as
where there is a design need or market pressure to solve a
problem and where there are a finite number of identified,
predictable solutions; and

(6) whether -- whether the change resulted more
from design incentives or market forces.

```
 1              To find it rendered the invention obvious, you must

 2    find that the prior art provided a reasonable expectation of

 3    success.  Obvious to try is not sufficient in unpredictable

 4    technologies.

 5              In determining whether the claimed invention was

 6    obvious, consider each claim separately, and consider only

 7    what was known at the time of the invention.

 8              In making -- in making these assessments, you

 9    should take into account any objective evidence, sometimes

10    called secondary considerations, that may shed light on the

11    obviousness or non-obviousness of the claimed invention.

12              The following are possible secondary consideration,

13    but it's up to you to decide whether secondary

14    considerations of non-obviousness exist at all.

15              These include:

16              (1) whether the invention was commercially

17    successful as the result of the merits of the claimed

18    invention, rather than the result of design needs or market

19    pressure, advertising, or similar activities;

20              (2) whether the invention satisfied a long-felt

21    need;

22              (3) whether others had tried and failed to make the

23    invention;

24              (4) whether there were changes or related

25    technologies or market need contemporaneous with the
```

1    invention;

2          (5) whether the invention achieved unexpected

3    results;

4          (6) whether others in the field praised the

5    invention;

6          (7) whether others sought or obtained rights to the

7    patent from the patentholder; and

8          (8) whether the inventor proceeded contrary to

9    accepted wisdom in the field.

10         Now, several times in my instructions I've referred

11   to a person of ordinary skill in the field of the invention.

12   It's up to you, ladies and gentlemen, to decide the level of

13   ordinary skill in the field of -- what the -- what the level

14   of ordinary skill is in the field of sonar.

15         In deciding this, you should consider all the

16   evidence introduced at trial, including but not limited to:

17         (1) the levels of education and experience of the

18   inventor and other persons actively working in the field;

19         (2) the types of problems encountered in the field;

20         (3) prior art solutions to those problems;

21         (4) rapidity with which innovations are made; and

22         (5) the sophistication of the technology.

23         In considering whether the claimed invention was

24   obvious, you must first determine the scope and content of

25   the prior art.

1           The scope and content of prior art for deciding

2     whether the invention was obvious includes at least prior

3     art in the same field as the claimed invention.

4           It also includes prior art from different fields

5     that a person of ordinary skill in the art would have

6     considered when trying to solve the problem that is

7     addressed by the invention.

8           Where the party challenging the validity of the

9     patent is relying on prior art that was not considered by

10    the PTO during examination, you may consider whether that

11    prior art is significantly different and more relevant than

12    the prior art that the PTO did consider.

13          If you decide it was different and more relevant,

14    you may weigh that prior art more heavily when considering

15    whether the challenger has carried its clear and convincing

16    evidence burden of proving invalidity.

17          If you find that Garmin infringed any valid claim

18    of the '022 or the '168 patent, you must then consider what

19    amount of damages to award Navico.

20          I'll now instruct you about the measure of damages.

21    By instructing you on damages, I'm not suggesting which

22    party should win this case on any issue.

23          If you find that Garmin has not infringed any valid

24    claim of the patents, then Navico is not entitled to any

25    patent damages.

1        The damages you award must be adequate to

2    compensate Navico for the infringement.  They are not meant

3    to punish the infringer.

4        Your damages award, if you reach this issue, should

5    put Navico in approximately the same financial position that

6    it would have been in had the infringement not occurred.

7        Navico has the burden to establish the amount of

8    its damages by a preponderance of the evidence.  In other

9    words, you should award only those damages that Navico

10   establishes that it more likely than not suffered.

11       While Navico is not required to prove the amount of

12   its damages with mathematical precision, it must prove --

13   prove them with reasonable certainty.

14       You may not award damages that are speculative,

15   damages that are only possible, or damages that are based on

16   guesswork.

17       There are different types of patent damages that

18   Navico may be entitled to recover.  In this case, Navico --

19   Navico seeks lost profits and a reasonable royalty.

20       Lost profits consist of any actual reduction in

21   business profits Navico suffered as a result of Garmin's

22   infringement.

23       A reasonable royalty is defined as the money amount

24   Navico and Garmin would have agreed upon as a fee for the

25   use of the invention at the time prior to when infringement

began.

  But regardless of the type of damages you may choose to award, you must be careful to ensure that the award is no more or no less than the value of the patented invention.

  I'll give you more detailed instructions regarding damages shortly. The determination of a damages award is not an exact science, and the amount need not be proven with unerring precision. You may approximate, if necessary.

  In this case, Navico seeks to receive lost profits for some of Garmin's sales of infringing products and a reasonable royalty on the rest of Garmin's sales.

  To recover lost profits, as opposed to reasonable royalties, Navico must show a causal relationship between the infringement and Navico's loss of profit.

  In other words, Navico must show that but for the infringement by Garmin, there's a reasonable probability that Navico would have earned higher profits.

  To show this, Navico must prove that if there had been no infringement, it would have made some portion of the sales that Garmin made of the infringing product, it would have sold more products that are functionally related to those products, or it would have sold its products at higher prices.

  Navico may only receive damages for lost profits

1    for those products that are sufficiently similar to compete

2    in the same market with the same customers as Garmin's

3    products that you find infringe.

4         Two products are sufficiently similar if one does

5    not have characteristics significantly different than the

6    other.

7         Navico is entitled to lost profits if it

8    establishes all of the following:

9         (1) that there was a demand for the patented

10   products.  Demand for the patented product can be proven by

11   significant sales of a patentholder's patented product or

12   significant sales of an infringing product containing the

13   patented features.

14        (2) that there were no available, acceptable

15   non-infringing substitute products; or if there were, its

16   market share of the number of the sales made by Garmin that

17   Navico would have made, despite the availability of other

18   acceptable non-infringing substitutes.

19        To be an acceptable non-infringing substitute, a

20   product must have the advantages of the patented invention

21   that were important to the people who purchased an alleged

22   infringer's product.

23        If purchasers of an alleged infringer's product

24   were motivated to buy that product because of features

25   available only from the product -- from that product and the

patentholder's patented product, then some other alternative product is not an acceptable substitute, even if it otherwise competed with the patentholder's and an alleged infringer's products.

On the other hand, if the realities of the marketplace are that competitors other than the patentee would likely have captured the sales made by the infringer, despite the differences in the products, then the patentee is not entitled to lost profits on those sales.

An alternative product may be considered available as a potential substitute even if the product was not actually on sale during the infringement period.

Factors suggesting the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily -- readily available at the time of infringement.

Factors suggesting the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether an alleged infringer had to design or invent around the patented technology to develop an alleged substitute.

(3) that Navico had the manufacturing and marketing capacity to make any infringing sales actually made by Garmin and for which Navico seeks an award of lost profits. In other words, that Navico was capable of satisfying the

1    demand.

2        This means that Navico must prove it is more

3    probable than not that it could have made and sold or could

4    have had someone else make and sell for it the additional

5    products it says it could not have sold but for the

6    infringement.

7        (4) the amount of profit that Navico would have

8    made if Garmin had not infringed.

9        Navico may calculate its lost profits on lost sales

10   by computing the lost revenue for sales it claims it would

11   have made but for the infringement and subtracting from that

12   figure the amount of additional costs or expenses it would

13   have incurred in making those lost sales, such as cost of

14   goods, sales costs, packaging costs, and shipping costs.

15       Certain fixed costs that do not vary with increases

16   in production or scale, such as taxes, insurance, rent, and

17   administrative overhead should not be subtracted from a

18   patentholder's lost revenue.

19       If you find that Navico has established patent

20   infringement, Navico is entitled to at least a reasonable

21   royalty to compensate it for that infringement.

22       If you find that Navico has not proved its claim

23   for lost profits or has proved its claims for lost profits

24   for only a portion of the infringing sales, then you must

25   award a reasonable royalty for all infringing sales for

1   which it has not been awarded lost profits damages.

2          A royalty is a payment made to a patentholder in

3   exchange for the right to make, use, or sell the claimed

4   invention.

5          A reasonable royalty is the amount of royalty

6   payment that a patentholder and an alleged infringer would

7   have agreed to in a hypothetical negotiation taking place at

8   a time prior to when infringement first began.

9          In considering this hypothetical negotiation, you

10  should focus on what expectations of the patentholder and

11  the alleged infringer would have been had they entered into

12  an agreement at that time and had they acted reasonably in

13  their negotiations.

14         In determining this, you must assume that both

15  parties believed that the patents-in-suit were valid and

16  infringed and both parties were willing to enter into an

17  agreement.

18         The reasonable royalty you determine must be a

19  royalty that would have resulted from the hypothetical

20  negotiation and not simply a royalty that either party

21  would have preferred.

22         Evidence of things that happened after infringement

23  first began can be considered in evaluating the reasonable

24  royalty only to the extent that evidence aids in assessing

25  what royalty would have resulted from a hypothetical

1  negotiation.

2       Although evidence of the actual profits of an

3  alleged infringer may be used to determine the anticipated

4  profits at the time of the hypothetical negotiation, the

5  royalty may not be limited or increased based on the actual

6  profits the alleged infringer made.

7       Where the parties dispute a matter concerning

8  damages for infringement, it is Navico's burden to prove

9  that it was more probable than not that Navico's version is

10  correct.

11       Navico must prove the amount of its damages with

12  reasonable certainty, but it need not prove the amount of

13  its damages with mathematical precision.  Navico is not

14  entitled to damages that are remote or speculative.

15       The amount you find as damages must be based on the

16  value attributable to the patented technology as distinct

17  from other unpatented features of the accused product.

18       Navico bears the burden to establish it -- to

19  establish the amounts attributable to the patented feature.

20       This is because the Patent Act provides a

21  reasonable -- the Patent Act provides that reasonable

22  royalty damages be calculated for the use made of the

23  inventor -- for the use made of the invention by the

24  infringer.

25       Therefore, when the patented invention is just one

feature of a product with multiple features, the patentholder must give evidence that tends to separate or apportion between the patented component or feature and the unpatented components and features, and such evidence must be reliable and tang -- tangible and not conjectural or speculative. It's not appropriate to award a reasonable royalty on a device for which lost profits are awarded.

A reasonable royalty, if any, may be calculated as a running royalty, which represents a stream of payments over time determined by -- by multiplying a royalty rate or unit amount times a royalty base or total number of units, or in the alternative, a reasonable royalty may be calculated as a one-time lump-sum payment.

You should select the method of calculating a reasonable royalty in this case that you believe is appropriate considering all of the evidence that has been presented during the trial.

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the infringement began.

Some of the kinds of factors that you may consider in making your determining are:

(1) the royalties received by the patentee for licensing of the patents-in-suit proving or tending to prove an established royalty;

1       (2) the rates paid by the licensee for the use of

2  other patents comparable to the patents-in-suit;

3       (3) the nature and scope of the license, as

4  exclusive or nonexclusive, or as restricted or nonrestricted

5  in terms of territory or with respect to whom the

6  manufactured product may be sold;

7       (4) the licensor's established policy of

8  marketing -- established policy and marketing program to

9  maintain his or her patent monopoly by not licensing others

10  to use the invention or by granting licenses under special

11  conditions designed to preserve that monopoly;

12       (6) (sic) the commercial relationship between the

13  licensor and licensee, such as whether they are competitors

14  in the same territory in the same line of business or

15  whether they are inventor and promoter;

16       (6) the effect of selling the patented specialty in

17  promoting sales of other products of the licensee, the

18  existing value of the invention to the licensor as a

19  generator of sales of his non-patented items and the extent

20  of such derivative or convoyed sales;

21       (7) the duration of the patent and the term the

22  license;

23       (8) the established profitability of the product

24  made under the patents, its commercial success, and its

25  current popularity;

1    (9) the utility and advantages of the patented

2 invention over the old modes or devices, if any, that had

3 been used for working our similar results;

4    (10) the nature of the patented invention, the

5 character of the commercial embodiment of it as owned and

6 produced by the licensor and the benefits to those who have

7 used the invention;

8    (11) the extent to which the infringer has made use

9 of the invention and any evidence probative of the value of

10 that use;

11    (12) the portion of the profit or of the selling

12 price that must be customary in the particular business or

13 in comparable business to allow for the use of the invention

14 or analogous inventions;

15    (13) the portion of the realizable profit that

16 should be credited to the invention as distinguished from

17 non-patented elements, the manufacturing process, business

18 risks, or significant features or improvements added by the

19 infringer;

20    (14) the opinion and testimony of qualified

21 experts;

22    (15) the amount that a licensor, such as the

23 patentee, and a licensee, such as the infringer, would have

24 agreed upon at the time the infringement began if both had

25 been reasonably and voluntarily trying to reach an

1   agreement; that is, the amount which a prudent licensee who

2   desired as a business proposition to obtain a license to

3   manufacture and sell a particular article embodying the

4   patented invention would have been willing to pay as a

5   royalty and yet be able to make a reasonable profit and

6   which amount would have been acceptable by a prudent

7   patentee who was willing to grant a license.

8          No one factor is dispositive, ladies and gentlemen,

9   and you can and you should consider the evidence that has

10  been presented to you in this case on each of these factors.

11         You may also consider any other factors which in

12  your minds would have increased or decreased the royalty the

13  infringer would have been willing to pay and the patent

14  owner would have been willing to accept acting as normally

15  prudent business people.

16         Garmin and Navico agree that the date for which

17  damages, if any, commence is December the 29th, 2015, for

18  the '022 patent, and January the 26th, 2016, for the '168

19  patent.

20         With regard to the Plaintiffs' claims for false

21  advertising, which you've heard about during the trial, the

22  Court has determined that there are sufficient factual and

23  legal reasons why the Court should address this issue

24  separately and should not include it in the verdict form for

25  your consideration; and that you should not consider any

```
1    questions related to false advertising.

2            During your deliberations, ladies and gentlemen,

3    you should disregard any evidence presented to you during

4    the trial which relates to allegations of false advertising.

5            With these instructions, ladies and gentlemen, we

6    will now hear closing arguments from counsel for each of the

7    parties.

8            Plaintiff may now present its first closing

9    argument.

10           Would you like a warning on your time, Mr. Dacus.

11           MR. DACUS:  I would, Your Honor.  If you would let

12   me know when I have used 20 minutes, please?

13           THE COURT:  When you have used 20 minutes?

14           MR. DACUS:  Yes, sir.

15           THE COURT:  I will.  You may proceed.

16           MR. DACUS:  Thank you very much.

17           Good morning.

18           I want to start this morning exactly where we

19   started last Thursday, and that is to say on behalf of

20   Gordon Sprouse and the men and women who work at Navico, a

21   very sincere thank you.

22           I told you when we started this case last Thursday

23   that we wouldn't be here if this case was not important to

24   Navico.

25           My hope is that you have a little bit of a sense of
```

1    why I said that.  And I want you to know, because I know

2    that the people at Navico want you to know, that their

3    thanks to you is really unconditional, no matter what your

4    verdict is in this case.

5          Navico has wanted one thing from the beginning, and

6    that is an opportunity to come to court in a public forum

7    and present the facts and evidence as they believed them to

8    be, and let the chips fall where they may.

9          So regardless of where your verdict is, regardless

10    of what you find, it is a sincere thanks.

11          Now, you remember on Monday we started by talking

12    about a timeline, and I put up these events.  You've seen

13    this before.

14          All of those events are true.  All of those events,

15    I think, occurred exactly like the timeline says.  But there

16    are a few things that we didn't talk about on Monday that I

17    think there's evidence for now that I would like for you to

18    consider when you deliberate, and it's these.

19          Do you remember in sort of the mid-2012 there, that

20    the executives and management at Garmin were upset because

21    they had -- they did not have downscan technology.  They

22    were getting beat in the marketplace.  They were losing

23    sales.  Their traditional sonar products were going to be

24    obsolete in a short amount of time.

25          You also remember that as late as 2013 -- late

1    2013, Troy Simonton -- you remember him from Garmin.  He was

2    the engineer who was heading up the -- the DownVu project,

3    still did not have a completed product.

4         You remember you heard from him some pretty candid

5    statements where he's writing to his mentor saying:  I've

6    done everything I can.  This company thinks I have a

7    completed product ready to go, but I don't.  In fact, the

8    prototype he created, the manufacturer wouldn't even attempt

9    to make.

10        Couple other things, dates I want you to consider,

11   and it's this.

12        In February of 2012, Garmin hired the three Navico

13   inventors on the '022 patent.  And what they did as part of

14   that hiring, you may remember, is they required the inventor

15   that you heard from on this stand, Mr. Maguire, to disclose

16   his prior inventions.

17        And one of those inventions that he disclosed was

18   the patent application, which as he readily admitted at that

19   time, was public information, even though it had not yet

20   become a patent, entitled Linear and Circular Downscan

21   Imaging Sonar.  Of course, that's the '022 patent.

22        What I also want you to think about -- if we go

23   right out here to late 2012, one other thing that's

24   important.  Remember this figure was in Mr. Maguire's

25   patent, right?  This was something that he disclosed.  This

1    is that aerial photo of what downscan looks like.

2          So in late 2012, we know from the testimony in this

3    case that Garmin sat down for a kickoff to start trying to

4    develop their downscan sonar.

5          What we also know from that document is that they

6    had a figure in that document, and it probably looks very

7    similar to what exactly was in the '022 patent.  Same boat,

8    same diagram.

9          One additional thing that I want to talk about on

10    this timeline before we get down to infringement, and that's

11    this:  You remember after Garmin -- well, let me back up and

12    say this.

13          Although Mr. Simonton had no product in late 2013,

14    by early 2014, Garmin had a product on the market.  And

15    sometimes lawsuits are as much about what evidence you do

16    not hear as evidence you do hear.

17          And here's why I say that.  You remember Mr.

18    Simonton, the head of the project, on the stand, and he

19    said:  Yeah, I just couldn't figure this out.  I didn't know

20    what to do to get downscan.

21          Think about what you didn't hear.  Think about what

22    you expect to hear from the engineer who actually develops

23    downscan.

24          After he said, I couldn't do it, you expect to

25    hear, but here's how I figured it out.  Here's the engineer

1   drawings.  Here's the design specifications.  And here's how

2   we figured this stuff out.  You never heard that.  You never

3   heard that.  And I'd submit to you there's a reason you

4   didn't hear it.

5          By early 2014, Garmin has a product in the

6   marketplace.

7          Now, once they put that product in the marketplace,

8   as you now know, at the end of 2015 in December, the '022

9   patent issues.  They continued to use the '022 patent

10  invention and the '168 invention.  And the lawsuit was filed

11  in March of 2016.

12         And then about six months later, after this lawsuit

13  was beginning to heat up, the facts were starting to come to

14  light, what happened?  They decided to change to ClearVu.

15  And there's some things I want you to think about that you

16  heard in evidence.

17         Think about the urgency with which they tried to

18  implement ClearVu.  The testimony was from Mr. Dunn from

19  Garmin, that would normally be a process that took a year or

20  two.

21         But yet here they are running around at break-neck

22  speed trying to introduce this ClearVu product, only in the

23  U.S., mind you, not anywhere in the world, only in the U.S.

24         Now, let's turn to infringement and the questions

25  that you're going to answer here.

1          With respect to the '022 patent, I told you at the

2    beginning of this case on Monday (sic) that this has been a

3    long, hard road.  And, you know, when you stand up here and

4    say this as a lawyer to jurors, you're like, are they really

5    going to understand that or not?  And I think this is a

6    prime example.

7          You remember Mr. Vincent, our expert took the

8    stand.  He went through every single claim limitation,

9    one-by-one, right, because they would not stipulate to any

10   of them.  They wouldn't agree that any of them were met.

11         And in the end, there's really only one thing they

12   contest in this '022 patent, and it's whether or not the

13   linear downscan transducer element is positioned within the

14   housing to -- in this highlighted, what they contest -- to

15   project fan-shaped sonar beams directly beneath the

16   watercraft.  So that's your decision.  It really boils down

17   to that.  Does their product do that?

18         So what does the evidence show you?  Well, here's

19   what Garmin's own literature says.  Its picture shows it

20   being projected beneath the boat, and its own literature

21   says:  Pass below your boat.

22         What does the evidence in the case say?  This is

23   Mr. Simonton.  Keep in mind who he is.  This is the

24   individual who built the product, built the Garmin product.

25   He knows it inside and out.  What does he say about whether

1    or not it projects a fan-shaped sonar beam beneath the boat?

2    I'm looking at the second question.

3           The DownVu product projects that fan-shaped sonar

4    beam directly underneath the watercraft, right?

5           And he said:  And to the sides, yes.

6           So projects it beneath?

7           And to the sides.

8           So just to be clear, the DownVu transducers do

9    create a fan-shaped beam that projects directly beneath the

10   watercraft within the 3dB boundaries; is that right?

11          He said:  You know, the center axis of that.

12          And he said:  You're talking about the 16-degree

13   tilt.

14          Of course, that's what we were talking about.

15          And he said:  Yes.

16          He didn't want to, but he said:  Yes.  It projects

17   that fan-shaped beam beneath the boat.

18          Now, one thing that was said during the trial, and

19   it may be said today, is the term "3dB" does not appear in

20   the patent.  But in some ways it does, because sonar beam is

21   not defined by the Court.  So sonar beam, we have to

22   understand what that means.

23          And you remember that every expert who took the

24   stand said that a sonar beam is defined by this -3dB.

25          So when they say to you -3dB is not in the patent,

```
 1    the words aren't there, but that's how one skilled in the
 2    art -- and you can look at this.  The Court just read this
 3    instruction to you.  I think it was on Page 7.  I was
 4    following along.  You have to use the definition for one
 5    skilled in the art for sonar beam.
 6            So their own -- their own person who built this
 7    product admits they infringe.
 8            Who else admits it?  Dr. Huff.  You remember that's
 9    Garmin's expert on invalidity.  But we asked him about this
10    issue that relates to infringement.
11            And we said:  Dr. Huff, when the '022 and '168
12    patents and the claims talk about sonar beam, the patent is
13    referring to the beam at the -3dB boundary, correct?
14            He said:  Yes.
15            True for both patents.
16            So then we asked him the ultimate question:  You
17    agree with my client -- that's Mr. Bradley talking to him --
18    that Garmin's tilted DownVu element insonifies the area
19    directly beneath the watercraft with the -3dB boundaries of
20    the sonar beam, right?
21            And he said:  Yes, it does.
22            Same thing our expert says.
23            So their expert, our expert, and the man who
24    built the DownVu product all say this infringes.  So when
25    you answer that first question on the Court's verdict
```

1    form, I would respectfully suggest to you that the

2    evidence compels you to answer that question yes.

3         And you'll see the question in detail when you look

4    at it.  If any claim is infringed in any of those three ways

5    that the Court just recited to you, directly, contributory,

6    or by inducement, any of those, not all of them, any of

7    them, then you should answer that question yes.

8         Now, the '168 patent really boils down to a single

9    issue here.  And that is whether or not the linear

10   transducer element and the circular transducer element

11   receive a same transmit signal.

12        I'm not going to belabor because I think it's

13   actually fairly simple.  This is the engineering drawing

14   that you saw, and you remember that the way this product

15   works is it has a single transmitter that sends a single

16   signal to the linear transducer and the circular transducer.

17   A single signal.

18        The only defense they have for that is somewhere

19   along the way on some products there's a filter.  It doesn't

20   change that it comes from a single source, a single

21   transducer, it is a single signal, and that's what the claim

22   requires.

23        Now, even they admit that only a portion, only half

24   of these things have a filter.  So they admit infringement

25   for the other portion.

1        This is Dr. Michalson, their own expert, admitting

2    that not all products have this filter that leads to their

3    defense.  So, again, when you answer the question of

4    infringement related to the '168, I would respectfully

5    suggest to you that the evidence says yes, there is an

6    infringement.

7        Now, what about invalidity?  I want to cover at a

8    high level invalidity because I think there's some important

9    points here.

10        The law says that you can't just use hindsight to

11    come back and say, oh, anyone could have invented this,

12    because that -- that often is the case after someone makes

13    an invention, right?  In other words, it's easy for lawyers

14    to come up here and say, oh, we had the sidescan and all

15    they did is turn it over.

16        Well, if that's true, why hadn't they done it for

17    the last 30, 40, or 50 years?  Why hadn't they done it?

18    Going all the way back to that Tucker reference in 1960.  No

19    one had done.

20        In fact, it's a bit insulting, I think, to having

21    the inventor of downscan, Mr. Maguire, who used to work at

22    Navico but now works at Garmin, come to court and testify

23    and say, all you invented, sir, was taking sidescan and turn

24    it upside down.

25        Now, remember what their burden is here.  They have

1   to prove it by clear and convincing evidence.  What they

2   want you to find is that the Patent and Trademark Office got

3   it wrong 18 times.

4          Why do I say that?  Because remember, every claim

5   is a separate invention.  The Court just read that to you.

6   You have to find all 18 claims are invalid.

7          Remember that every piece of evidence that they put

8   in front of you was in front of the Patent and Trademark

9   Office.  The examiners at the trademark office had that

10  information in front of them when they made the decision on

11  whether or not to issue the patent.

12         The patent -- the '022 patent was in the Patent

13  Office for more than six years.

14         And here's what's most important, I think.  The

15  Court just read to you, you can look in your jury

16  instructions, invalidity has to be determined

17  claim-by-claim.

18         What that means is the process here is much like

19  infringement.  If they're going to say that there was an

20  invention before ours, they have to take that alleged prior

21  invention, compare it to the claims, every word in the

22  claim, they have to match up every single word.  That's what

23  the Court's instructions say to you.  You can look at them

24  when you have them back in the jury room.

25         They didn't do that.  You remember when Mr. Bradley

1    asked Mr. Huff yesterday, sir, you didn't show us a single

2    word in the claim, did you?

3            And he said no, I didn't.

4            And I would suggest there's a reason why they

5    didn't.

6            You remember that we asked Mr. Huff:  Sir, did --

7    did you follow the claim construction?

8            Look at the last question:  Did you use the

9    constructions and rationale that the Judge set forth in that

10   order when you prepared your opinions?

11           He said:  No, because I do not agree with it.

12           So think about the burden here.  They have the

13   burden to prove on a claim-by-claim.  They didn't show you a

14   single claim.  You're duty bound, as the Court just told

15   you, to follow his constructions.  And the man they want you

16   to follow affirmatively said on the stand, I didn't follow

17   the Court's constructions.

18           That should be the end of your -- your inquiry.

19   That should be the end of your questions on invalidity.

20           But if it's not, if it's not, there's a couple of

21   things to remember.

22           Mr. Huff admitted, they're going to get up here and

23   tell you about this Betts patent, which is also the

24   Humminbird patent.

25           Remember that the Betts patent, by their experts

1    own admission, does not have a linear transducer element.  I

2    mean, you know the '022 patent has it.

3        So the only way they can attempt to find invalidity

4    is to refer back to this 1960 article from a man named

5    Tucker that related to a transducer that was as tall as I

6    am, attached to some British research ship, and say that it

7    was obvious.  It was obvious to everyone that you could have

8    invented downscan.

9        And, again, if it was so obvious, why hadn't people

10   invented it before 2008 when Navico invented downscan?  I

11   mean, we all know and you all heard, there were millions and

12   millions of dollars to be made by being able to show a

13   fishermen a picture-like manage.

14       We know Garmin tried for years and years and years.

15   We've heard from their vice president of worldwide sales who

16   said, I've asked these engineers for years and years to

17   please get us a downscan product, and they couldn't do it.

18   Yet in this court, they want to tell you that it was

19   obvious.

20       If you find that there's infringement, you're going

21   to, of course, be asked about the question of damages.

22       Mr. Bakewell walked you through in detail how to go

23   about calculating.  The Court just read you his

24   instructions.  They're consistent with what Mr. Bakewell

25   used in calculating damages.  He calculated both lost

1    profits and reasonable royalty on the '022.

2         You remember for lost profits, we have to -- we

3    have to prove to you these four items under the Panduit

4    test.  You can walk through them when you look back there.

5    I think there's no doubt that each one of them is met.

6    There's no doubt that there's demand for the product.

7    There's no doubt that Navico had the capacity.  And there's

8    no doubt that there's really no acceptable alternative.

9         And I want to emphasize that word "acceptable,"

10   because I think they'll probably get up here and tell you

11   that there are alternatives.  Yes, there are alternatives,

12   there's sidescan, which we all know from seeing it is very

13   difficult to read because the bottom is actually on the left

14   or the right rather than the bottom.  That's not an

15   alternative to a picture-like image that's very easy to

16   read.

17        They'll probably tell you that ClearVu is an

18   alternative.  We know that's not the case.  We know that it

19   cannot be an alternative because that product says -- we --

20   we saw those pictures.

21        People think they're seeing what's below their boat

22   when, in fact, it could be 30 yards to the left or right, or

23   depending how deep you are, it could be a hundred yards to

24   the left or right of your boat.  So those are not acceptable

25   alternatives.

1          Mr. Bakewell walked through with you how to

2    calculate damages.  At a high level, you remember that what

3    he's required to do under the law and what you're required

4    to do under the law is to reallocate the market, assuming

5    Garmin is not in the market infringing, how many additional

6    sales would Navico have made based on their market share.

7          He calculated that.  It was roughly 110 or 11

8    thousand units, 118 to be exact.  He walked through the

9    amount of revenue that would lead to.  He deducted out the

10   cost that he's required to deduct.  And Navico's lost

11   profits are $29,650,382.

12         Now, that's not all the units that Garmin sold.  As

13   the Court just instructed you, you're allowed to award lost

14   profits for those portions that we would have sold.  That's

15   118,000.  But Garmin sold an additional 69,000.  They don't

16   get to sell those without paying some fair compensation for

17   that 69,000.

18         The compensation they're required to pay is what's

19   called a royalty.  And as the Court just instructed you,

20   essentially the royalty says you need to value or determine

21   the value of this downscan feature.

22         You remember this document that Mr. Bakewell put

23   up.  It's PX-59.  It shows the value -- this is a Garmin

24   document.  It shows the value, at least for lower-level

25   products, of what Garmin believed this downscan feature was

1    worth.  Ranged anywhere for lower -- lower-level products

2    from 50 to a hundred dollars.

3            Mr. Bakewell walked you through those

4    Georgia-Pacific factors and exactly how you go about

5    calculating a running royalty.  And you remember he said

6    there are some upward adjustments we need to make because of

7    Georgia-Pacific.  And he said if you look at the higher-end

8    products --

9            THE COURT:  20 minutes have been used.

10           MR. DACUS:  Thank you, Your Honor.

11           These folks make as profit on the higher-end

12   products, you know, 5- or $600 per unit.  And he came up

13   with a reasonable royalty rate of $118.  Apply that to the

14   total units, and that's a royalty of $8.1 million.

15           Now, with respect to the '168 patent, you remember

16   that's a patent that saves cost.  The cost saves are $5.40.

17   That's related to the transmitter and the space on the -- on

18   the board.  You apply that $5.40 to the number of units that

19   they sold, and that number is $964,000 as a reasonable

20   royalty, total damages for the '168 patent.

21           I'll reserve the rest of my time, Your Honor.

22           THE COURT:  All right.  The Defendant may now

23   present its closing argument to the jury.

24           Would you like a warning on your time,

25   Mr. Groombridge?

1          MR. GROOMBRIDGE:  I would, Your Honor.  Five

2    minutes if -- if that's fine.

3          THE COURT:  Five minutes remaining.  You may

4    proceed.

5          MR. GROOMBRIDGE:  Thank you, Your Honor.

6          Ladies and gentlemen, good morning again.  And

7    certainly on behalf of Garmin, I would very much like to

8    thank you for the time you have spent this week.  We take

9    this case extremely seriously.  And we know that you are

10   going to take it as seriously, and we look forward to your

11   verdict.

12         Now, I'd like to begin where I began when we first

13   spoke and talk about what this case is really about.  What

14   it's about is competition.  What it's about there is -- as

15   we see, this is Navico writing:  Garmin whipped us.  Danger,

16   they will become No. 1 in the market.  That's what's really

17   going on.

18         What's going on here, ladies and gentlemen, is they

19   have come into this courtroom to ask you to give them the

20   things they cannot get in fair and square competition in the

21   market.

22         And let's walk through and see why that is so.  I'd

23   like to start by talking about infringement.

24         The -- here are the -- the key issues from the

25   claim to cover an infringement.  There is downscan, which as

1    the Court has told us, means downwardly pointed.

2         And also for the '022 patent, having a transducer

3    that is positioned to project fan-shaped sonar beams

4    directly beneath the watercraft.

5         And for the '168 patent, again, having a transducer

6    that is positioned to produce a beam that it goes in a

7    substantial -- a direction substantially perpendicular to

8    the surface of the water.  In other words, substantially

9    perpendicular to -- meaning down.

10        Now, what do these have in common?  They have in

11   common that they're all talking about how the beam is

12   pointed.

13        And, ladies and gentlemen, you may recall that we

14   had some testimony about that, and we used the analogy of a

15   flashlight.  What if we turned out the lights in the

16   courtroom and there was someone sitting in this chair, and

17   we took a flashlight and pointed it at the easel.  We might

18   very well see some of the light lighting up that person's

19   face.  It would not mean that the flashlight was pointed at

20   that person.  The flashlight would be pointed at the easel.

21        And what is going on in these claims is that they

22   are very clearly telling us you look at where the beam is

23   pointed, and the patent tells us that, as well.

24        If we look at -- as Dr. Michalson went through and

25   told us, we look at the main response axis.  These are the

 1    drawings from the patent.  That purple line is the main

 2    response axis.  We're not looking at the edges of the beam.

 3    We're looking at where the beam is going.

 4         If we do that, we will find that there is no

 5    infringement in this case.  The main response axis of the

 6    Garmin tilted product is not substantially perpendicular to

 7    the water.  It's at 16 degrees offset.  And I submit, ladies

 8    and gentlemen, no one would say that is substantially

 9    perpendicular.

10         If you're having a fence built, someone put the

11    fence post in at 16 degrees, you wouldn't come back and say

12    I think that's fine and substantially perpendicular.

13         What does Navico argue?  Navico says:  Well, let's

14    look at something called the 3dB level, right?  And Mr.

15    Dacus predicted this correctly because it is nowhere in the

16    claims of the '022 patent, and it is nowhere in the claims

17    of the '168 patent, and it is nowhere in the Court's claim

18    construction.

19         And I hope I wrote this down correctly.  I

20    certainly tried to.  But I think, as Mr. Dacus just said,

21    with reference to the patent, the words aren't there,

22    Plaintiffs' 3dB.

23         So the -- why are they talking about -3dB?  Well,

24    there -- by the way, they also said:  Oh, well, Dr. Huff

25    admitted that this is the right thing to do.  This is Dr.

1    Huff's testimony -- in the question where he was asked

2    specifically about the claims, as opposed to other parts of

3    the patent, here's what he said:  They're talking about

4    sonar energy within the 3dB boundaries.

5         He was asked -- answered:  That's not my

6    interpretation.

7         Now, the patent tells us how to answer this

8    question.  The patent tells us what the invention is not.

9    And anyone picking it up and looking at it, the first thing

10   they would see is this -- this drawing, Figure 4.

11        We heard a lot about it.  Prior art.  That means

12   this is not what we invented.  It's different.  It's, in

13   fact, sidescan.  And I think there was pretty much agreement

14   about that.  This is sidescan.

15        But let's look at that.  What do we -- what does it

16   tell us about the thing that is not the invention?  Well,

17   look at the yellow beam.  It's tilted.  Does it -- it's

18   directed down from the boat, and it's certainly sending

19   sonar energy underneath the boat.

20        So, ladies and gentlemen, what do we know from

21   that?  It's not enough that there be sonar energy under the

22   boat.  It's not enough that the -- the sonar energy be going

23   downwards, and it's not enough if something is tilted,

24   right?  It has to be different from that.

25        Now Navico is trying to run away from what this

shows, what this patent tells us.

Remember Dr. Vincent when he was asked about this: Would you agree it depicts a sonar beam underneath the boat?

No, he's not willing to agree to that.

Would you agree that whatever it is, it's going underneath the boat?

No, I'm not willing to agree to that.

Would you agree at least that it's directed downwardly?

No, I'm not willing to agree to that.

What's going on here, ladies and gentlemen, is Navico is trying to run away from the plain truth, what is visible to all of us, that a tilted sonar that's sending energy under -- down and under the boat isn't necessarily what is covered by these claims.

In fact, they have to show more than that. They have to show that it's pointed substantially perpendicular to the water. And they can't. They haven't.

The -- as the Court instructed you, we interpret patents from the standpoint of the person of ordinary skill in the art.

And when we look at the evidence that we heard about ordinary skill and how do we know whether a sonar beam is pointed substantially perpendicular to the -- to the surface of the water, we heard that. We heard from Mr.

1    Maguire, the inventor, who is certainly a person of ordinary

2    skill.

3            This is him answering a question from Navico's

4    lawyer, Mr. Stevens.

5            And again he says:  Well, what he was trying to do

6    in this patent is point the transducer straight down; and

7    once you start pointing it to the side, it's sidescan.

8            That's what that drawing in the patent tells us is

9    not the invention.

10           And, indeed, Dr. Vincent said the same thing.  He

11   didn't say it in his testimony in -- here in open court.  He

12   said it in his testimony -- some of his prior testimony,

13   right, that when he was confronted with that, he said:  How

14   do we know?  In a sidescan system, the transducer is

15   oriented to the side, and in a downscan system it's oriented

16   straight down.

17           So we know how people of ordinary skill interpret

18   this, right?  And no one, I suggest, ladies and gentlemen,

19   no one would say something that's pointed at 16 degrees is

20   pointed straight down.

21           Now, why does it matter?  Mr. Maguire told us, when

22   it's pointed straight down, you get equal energy on both

23   sides of the boat.  And we see that in the drawing here on

24   the left, the -- you would see equal side -- coverage on

25   both -- on both sides.

1          In the drawing on the right, you see what you get

2    from the Garmin tilted product, much more coverage on one

3    side and less coverage on the other.

4          Now, ladies and gentlemen, what we heard from

5    Navico on infringement was also a kind of Plan B.  It was,

6    well, if you don't find there's a literal infringement, then

7    we're going to go to something called the Doctrine of

8    Equivalents.

9          And what that is, ladies and gentlemen, is -- it's

10   interesting that they would say that because it suggests

11   that maybe they're not so confident in their -- their first

12   argument about infringement.

13         That's like, you know, if your kid comes to you, a

14   window is broken, a child says:  I didn't break the window,

15   but if I did, it was an accident, right.

16         This is the -- the second line of argument here

17   about why they say that there is an infringement, even if,

18   ladies and gentlemen, you were to find that the beam in the

19   Garmin product is not pointed in a direction substantially

20   perpendicular to the surface of the water.

21         And now what they say is, well, it does the same

22   thing anyway.

23         We know that's not true.  Mr. Maguire's notebook --

24   I would put up here, it says that what -- what he was trying

25   to cover was -- what he was -- what his system does is

1    sidescan with no shadows.

2            And we heard unrebutted testimony from Mr. Simonton

3    that you do get shadows and that the shadows matter because

4    they help you interpret what the image -- the -- the image

5    that you're seeing.

6            Now, I'd like to turn at this point to the other

7    kinds of infringement about which you will be asked, what we

8    call indirect infringement.  And as His Honor instructed,

9    that comes in two forms:  Inducement and contributory

10   infringement.  And I'll start with inducement.

11           And this is the -- it's amongst the instructions

12   that the Court just gave, and it will be in the written

13   instructions that go back with you to the jury room.

14           If you find -- if Garmin believed that it was not

15   infringing the asserted patent, it cannot be liable for

16   inducement.

17           And ladies and gentlemen, you saw the Garmin

18   witnesses.  You saw Mr. Dunn, you saw Mr. Simonton as they

19   testified, and you are, of course, the judges of credibility

20   to determine whether they thought that they were infringing

21   the patent.

22           I suggest that when we look at everything that

23   Garmin did in this case, it is clear that it was going the

24   extra mile to try to avoid any kind of infringement.

25           As Mr. Dacus mentioned, there was an original

 1    product.  They went to the tilted product to try to get away

 2    from any -- from what Navico is doing.

 3           Then after that, they were sued, changed again,

 4    went to the ClearVu product.  And I'll come back to that in

 5    a minute.  But still not sufficient.  They got sued again.

 6           So I think if we put -- we look at all of these

 7    actions, what we see is that Garmin was trying very, very

 8    hard to make sure that it was not doing anything that would

 9    be an infringement.  And indeed, try to find something it

10    could do that even Navico would agree was not an

11    infringement.

12           And, in fact, it was successful, came to the

13    ClearVu product, right.  But -- so, ladies and gentlemen, I

14    think there can be -- if we just look at the totality of the

15    evidence, it's very hard to see how anyone could believe

16    that Garmin thought it was infringing and it was trying to

17    make its customers infringe.

18           Now, the second kind of indirect infringement is

19    contributory infringement.  And one of the things that

20    Navico has to prove there is that the product in question

21    has no substantial non-infringing use.

22           In other words, if you sell a product and could be

23    used to infringe but it could also be used for a lot of

24    other things, it can't be contributory infringement.

25           And we know here that the Garmin products that are

1    accused, the Garmin products for which Navico wants you to

2    award tens of millions of dollars, have lots of

3    non-infringing uses.

4         Remember, we saw some of these manuals.  These

5    chartplotters come with many, many features.

6         And, ladies and gentlemen, what we heard was that

7    despite all of those features, Navico wants to be paid for

8    these products because they came into this courtroom and

9    told you that, in their view, people are going out bass

10   fishing on their sailboat using their radar and their auto

11   pilot and looking up the tide information.  And we wanted

12   paid for all of that even though it has nothing whatsoever

13   to do with what's in these patents.

14        And, ladies and gentlemen, that tells us something,

15   it tells us what's really going on here is they want to be

16   paid for all of the things that Garmin did, even though they

17   have nothing whatsoever to do with these patents.

18        Now, when we come to the question that you will be

19   asked on, have they proved infringement, direct or indirect,

20   the answer to that is, I suggest, no.

21        And one thing I do want to comment on, Mr. Dacus, I

22   believe, suggested that Garmin is in way some conceding

23   infringement of the '168 patent.

24        That is absolutely not the case.  There is no

25   infringement of the '168 patent for the same reasons that

 1  there is no infringement of the '022 patent.

 2          Now, I have to address for a moment willful

 3  infringement.  And, again, these are from His Honor's

 4  instructions.

 5          Willful infringement is reserved for cases where

 6  the infringement is egregious, reckless, or done in bad

 7  faith.  I don't want to suggest that I think there is any

 8  infringement.  Again, I think this is worth looking at

 9  because we examine the evidence that has been presented.

10  It's very clear what's going on, right?

11          You remember that Mr. Dacus began with that

12  timeline, and he drew some green lines on the screen.  Every

13  single one of those green lines was in -- was before these

14  patents issued.  They were in 2011, and 2012, and 2013.

15          And the documents that they pointed to same, all

16  before the patent.

17          I ask you, ladies and gentlemen, how could Garmin

18  possibly have intended to infringe a patent that didn't even

19  exist yet?  The earliest of these patents didn't come out

20  until just after Christmas of 2013.

21          They -- all of the evidence that they want you to

22  look at and say, oh, Garmin was a willful infringer is

23  before that, years before that.

24          And, again, I think that tells us something.  It

25  was incumbent upon them, if they were going to make a

1    serious charge like willful infringement, to come into this

2    court and have something to prove it.  We have seen nothing.

3         Now -- so on that question, ladies and gentlemen,

4    again, we suggest the answer is no.

5         The -- let's talk about invalidity.  We'll go

6    through this; but the key point here is that in order to

7    find this patent valid, Navico is asking you to believe that

8    these words, "turned vertically downwards," do not mean

9    "turned vertically downwards."

10        Yesterday we heard from Dr. Vincent that they don't

11   mean that, they mean something else.  Vertical here just

12   means kind of 30 degrees.

13        And like so much in this case, they're trying to

14   run away from the evidence.  Turn vertically downwards is

15   not a difficult thing to understand, and it's right there in

16   the Tucker prior art.

17        Now, while I'm on that point, Mr. Dacus said a

18   number of times, well, if this invention was so obvious why

19   wasn't it made back many, many years ago?  And there's a

20   very good answer to that.

21        The -- remember this, the Humminbird unit, the

22   sidescan unit, came out to the market in 2005 or so, and by

23   2008, it was doing real well.  The -- as soon as that

24   happened, this invention followed in very short order.

25        And, yes, there were a lot of things in here that

1  weren't available back in 1960 or 1970, all those years ago;

2  but once Humminbird had done the work of making this

3  fishfinder small and affordable and easy to use for

4  fishermen, it didn't take but a year or so before these

5  inventions came along.

6       So the argument that somehow they should have been

7  made 30, 40, 50 years ago simply doesn't add up.  Doesn't

8  comport with the facts.

9       Now, let's look at what exactly happened here.

10      The -- we heard from Mr. Tucker, and we saw these

11 documents.  They say, oh, Garmin is trying to make this its

12 hindsight.  They're trying to gloss this over.

13      Sidescan pointed down isn't hindsight.  Those were

14 Mr. Maguire's words in July of 2008.  That's what this

15 invention is.

16      That picture that he took, remember, he told us, he

17 took it with this -- this Humminbird head unit.  All right.

18 Proving that if you change the orientation of the

19 transducer, you have everything else you need right here,

20 just as I hold it in my hand.

21      Now, the -- and Mr. Maguire also told us, that just

22 look, that's the key thing, you really only have to make one

23 change, just point the element down.

24      And let me also say that because there was a

25 suggestion that Mr. Maguire had somehow come to court and

 1  that it was unfair that he would do that.

 2          Remember Mr. Sprouse, Navico's corporate

 3  representative who has been chosen to come here and

 4  represent Navico and tell us Navico's side of the story, he

 5  admitted the same thing candidly, look, the invention --

 6  they -- they took the transducer from the Humminbird and

 7  turned it down.

 8          Yes.

 9          That's the invention?

10          Yes, sir.

11          All right.  So we know that, right.

12          And, again, I suggest, ladies and gentlemen,

13  they're trying to run away from the evidence here.

14          Now, if we look at Tucker, there's the transducer.

15  No dispute that it's -- it's capable of being pointed

16  straight down.

17          And we saw this yesterday, this was Dr. Vincent's

18  drawing to say, oh, well, it goes in the direction of the

19  blue line.  But even Dr. Vincent would admit eventually

20  that, yes, Tucker is entirely capable of rotating that blue

21  line to the point all the way straight down.

22          Now, let's just go back and look at some of the --

23  the key language in Tucker again.  The -- look at what

24  Tucker is telling people who want to work in the sonar

25  field.

1           Turn the sidescan vertically downwards, and it

2   forms a powerful tool for studying the sound-scattering

3   layers in the sea -- equally in a lake -- since owing to its

4   high resolution, it gives a great deal more information than

5   the wide-beam sounder.

6           And that's exactly what the '022 patent says.  If

7   you -- because the narrow fan beam has more -- gives more

8   resolution than the traditional puck-shaped device.

9           So Tucker told people who wanted to know that that

10  was a benefit from taking sidescan and turning it down all

11  those years ago.

12          And I would also like to respond to the suggestion

13  that the Patent Office got it wrong 18 times.  Tucker was

14  certainly before the Patent Office.

15          Ladies and gentlemen, if you look at the beginning

16  of the '022 patent -- and the same is true for the '168 --

17  you can see a list of all the references, all the -- the

18  things that the Patent Office had.

19          And it takes up nine pages of the patent.  I'm not

20  suggesting that you should go and count them, but if you

21  did, you would find that there are approximately 740 of

22  those references, right, 740 Tucker's -- tucked in there

23  somewhere.  Needle in a haystack.

24          So the -- yes, it was there.  Was it considered?

25  That is for you to decide.

1          The -- now, there was also a suggestion that we

2    heard just now and may hear again when -- when Mr. Dacus

3    gets back up here, that somehow Garmin didn't meet its

4    burden of proof because it was -- it didn't go through every

5    single claim and have someone put a little green checkmark

6    by it.

7          Ladies and gentlemen, what we're here to talk about

8    is the real world.  What we're here to talk about is what

9    really happened, not in an exercise of putting claim charts

10   up on the screen and checkmarks next to them.

11         And if we look at the evidence, it will tell us

12   with respect to each and every one of these claims, yes,

13   indeed, every one of these further dependent claims that

14   adds one more piece -- piece of detail, that piece of detail

15   is present in the Humminbird device.

16         So if we look at this, this is Mr. Maguire

17   testifying saying:  Of course, the Humminbird can do

18   side-by-side images.  Here's one of them.

19         If we look at Claim 53, this is Mr. Gibson

20   testifying, a gentleman who testified by video who was from

21   Humminbird saying:  Yes, it has two pieces binded together,

22   right, a first and a second element.

23         The -- also Mr. Gibson -- one of these claims that

24   said the -- the traditional and conical sonar have to

25   partly -- at least partly overlap.  Do they do that?

1          Yes, they do do that.

2          The -- and I'll show one more.  Here's another one

3    of those claims where it says:  Can you show nautical charts

4    on the screen at the same time that you show the sonar?

5          Here's Humminbird manual.  It's in evidence, right?

6    Of course, you can.

7          So I suggest, ladies and gentlemen, what's going on

8    here from Navico is an exercise in form over substance.

9    It's an exercise in saying let's not talk about what

10   happened, right?  Let's talk about claim charts and burdens

11   of proof and such like, right?

12         On burden of proof, of course we have the burden by

13   clear and convincing evidence.  Burden of proof is about the

14   facts.  And you are, as the instructions said, the sole

15   judge of the facts.

16         Are they really saying that these facts didn't

17   happen?  Are they really saying that Mr. Maguire didn't get

18   one of those Humminbird devices, that he didn't go out on

19   the lake, the technician didn't mistakenly turn the element

20   down?  Of course not.  We know what the facts are here,

21   right.

22         When we hear all of these things about, oh, well,

23   it's Garmin's burden, right?  What they're really saying is

24   let's not look at the facts.

25         Now -- so when we come to the questions on

 1  validity, we would ask that you go through and answer, yes,

 2  we have met our burden of proving each and every single

 3  claim invalid.

 4       Now, I'd like to talk about damages.  Why am I

 5  talking about damages?  Because, again, I think it's a very

 6  clear indication of what is actually happening in this case,

 7  that -- one of the things that we know is they're asking for

 8  lost profits.

 9       They're saying Garmin, we couldn't -- we didn't

10  make these sales in the real world, but in the "but for"

11  world of the courtroom, we'd like to have made them, and

12  we'd like to make the profits on the sales that we think we

13  made in the courtroom but we didn't make in the real world.

14       Well, they would have to prove that there is no

15  non-infringing substitute, because if there's a

16  non-infringing substitute, the answer is, look, even if

17  Garmin did infringe, it had another alternative available.

18  It could have sold the non-infringing product.

19       THE COURT:  Five minutes remaining.

20       MR. GROOMBRIDGE:  Thank you, Your Honor.

21       Here we have some powerful evidence of a

22  non-infringing substitute, and it's ClearVu.  First of all,

23  we know -- we have agreement that it doesn't infringe.  So

24  that part is taken care of.

25       And we know that it -- it's been out in the

marketplace.  We know that Garmin has sold 85,000 of these
products over the last 11 months.

We know that Garmin puts them on the shelf
side-by-side with the Lowrance product, and people buy them,
right?

And you know what, ladies and gentlemen, we know
they even cost more than the Lowrance product.  So I
suggest -- let's see if Mr. Dacus comes back to us with an
answer for why it is that if this product is not a perfectly
acceptable non-infringing alternative, people would purchase
it -- 85,000 of them, why they would pay more for it and why
Garmin has not received a single complaint about a customer
saying, you know what, I'm not happy with this.

And, remember, as Mr. Dunn told us, Garmin gives a
money back guarantee.  If you don't like the ClearVu, you
can come and get your money back.  And he testified that
hasn't happened.

So I suggest, ladies and gentlemen, we have just
about the best evidence one could have of a non-infringing
substitute, and there's no lost profits.

So if there's no lost profits, then what do they
say?  Well, we'd like a reasonable royalty.  And I thought
that they were going to -- we were going to see this and
they were going to ask for $98 each; but, in fact, I just
heard it's $118 they want -- $118 for every single

1    fishfinder.

2           Now, I also heard that -- Mr. Dacus say that the

3    amount of -- of extra price that Garmin gets is somewhere

4    between $50 and a hundred dollars.  So they want Garmin to

5    pay more for a royalty than the entire amount of extra money

6    that it gets in the door for selling something that has this

7    functionality in it.

8           And you know what, if we look at this, this is

9    their expert speaking.  And he says that the profit that

10   Garmin makes for the -- for the medium-sized units is $110

11   per unit, and for the smaller units it's $35 per unit.

12   That's what Garmin makes, according to -- in profit premium,

13   according to their expert.  But they want to be paid $118.

14          Now, what does that tell us, ladies and gentlemen?

15   What's really going on here is this is an effort to drive

16   Garmin out of this business.  If I'm making $35 profit on

17   something and I have to pay $118 in royalty, I'm not going

18   to be selling that thing, right?  That's like selling a

19   10-dollar bill for $30 -- purchasing a 10-dollar bill for

20   $30.  Who would do that?

21          So what is really going on here, as -- as we said,

22   is an effort to obtain in the courtroom what we can't get in

23   the marketplace.

24          If we look at this -- Dr. Vincent, again, we walk

25   through this.  Here's one of the products that they accused

1    of infringement.

2          If you follow the instructions and you connect it

3    with the transducer, it says connect it, it wouldn't be

4    covered by the '022 patent.  That's what he says.  But in

5    this lawsuit, Navico still wants to be paid, right.

6          Answer:  Yes.

7          That's what's going on.  That is the opposite of

8    reasonable.  That is completely unreasonable.  Nothing

9    reasonable about the royalties that they come in here and

10   ask for.

11         And so I'll -- I'll finish here by saying, ladies

12   and gentlemen, this is another one of the documents that we

13   saw internal to Navico.  They -- Garmin is doing very well.

14   And this is one of their executives writing to his employees

15   saying:  Got to perform much better.  Make sure you take

16   ownership.  Let's up our game.

17         Ladies and gentlemen, what Garmin respectfully

18   requests, send them a message.  The way to succeed in

19   business is not through lawsuits.  It's time for Navico to

20   get out of the courtroom, up its game, and get back to

21   competing in the marketplace.

22         We look forward to your verdict.  Thank you very

23   much.

24         THE COURT:  All right.  The Plaintiff may now

25   present its final closing argument.  You have nine minutes

```
 1    remaining, Mr. Dacus.  Would you like a warning on your
 2    final argument?
 3              MR. DACUS:  Let me know when I have two minutes,
 4    please, Your Honor.
 5              May I have the document camera, please?
 6              THE COURT:  You may proceed.
 7              MR. DACUS:  Thank you, Your Honor.
 8              What Garmin's lawyer just told you is on the issue
 9    of whether or not they need to compare on a claim-by-claim,
10    element-by-element basis and whether or not we need to, for
11    infringement, compare on an element-by-element
12    claim-by-claim basis, what he said is they're living in the
13    real world.
14              I don't know what that means, but here's what I
15    do know.  The Court has instructed you that you have to
16    go element-by-element, word-by-word, and claim-by-claim.
17    And that's exactly what you have to do, and that's what
18    they failed to do.  Apparently, because they think they
19    live in the real world.
20              But that -- whether or not the world's real or not
21    here, the Court's instructions are real.  That's what you're
22    duty-bound to follow.
23              And we know that the only issue on the '022 patent
24    is whether or not it projects -- if I can reduce that or
25    not -- I'll just read it.
```

1          Project fan-shaped sonar beams directly beneath the

2    watercraft.  And we know what the answer to that is.  The

3    guy who invented DownVu says it absolutely does that.

4          Now, there was some suggestion that, perhaps,

5    Navico does not want to compete fair and square.  And I --

6    you know, in the end, I think when you strip away all the

7    fancy lawyer words here, I think that is -- that is an

8    issue.  We have -- absolutely want to compete fair and

9    square.

10          But, you know, when you -- when you take

11    depositions in these cases, what you find out is if you take

12    enough of them, you eventually find someone at one of these

13    companies who's willing to tell the truth.

14          And you remember Mr. Kabel from Garmin in his

15    deposition, I think he really told you what was going on.

16    You remember he said, look, the way Garmin does business,

17    their method of business and their culture is to let

18    everyone else go out and do the hard work, do the research

19    and development, pay for it, go out and test your product,

20    go out to customers, and then we come in behind them after

21    all that work's done.

22          And here's how he described it:

23          Is that what you mean by the above:  The second

24    mouse often gets the cheese?

25          And he said:  That is what that phrase means, yes.

1          I think that tells you all you need to know here.

2   The cheese, of course, is money.  I mean, that's exactly

3   what's going on here.  These people want everyone else to do

4   the hard work, the research and development, the inventions,

5   testing of the product, taking it to consumers, and they

6   want to come in after the fact and take all that away,

7   without paying fair and valuable compensation that they're

8   required to pay.

9          Now, there's been a lot of discussion earlier about

10  taking responsibility for problems.  And I think that's

11  exactly what's going on here.  You remember when I asked Mr.

12  Dunn, sir, did y'all take responsibility for the problem

13  that you had created by not having sidescan and downscan.

14         And he said no.

15         And I said it's true, sir, that you just went out

16  there and put those in your products without ever asking for

17  permission, isn't that true?

18         And he said absolutely yes.

19         And I think he was pretty candid to say that's not

20  what they should have been doing.

21         Now, when you go through the verdict form, I want

22  to walk through the questions the Court's going to ask you.

23  The Court's going to ask you the first question:  Is there

24  any infringement of either the '168 or the '022 in any of

25  the three methods that the Court identified?

1          I would, respectfully, suggest to you that the

2     evidence says the answer to that question should be "yes."

3          The second question the Court's going to ask you is

4     whether or not that infringement, if you find it, has been

5     willful.

6          And this is what I would like you to consider on

7     the question of whether or not these people acted in bad

8     faith.

9          In March of 2012, we know that they had knowledge

10    of the patent.  This lawyer tried to suggest to you that

11    because the patent had not issued until 2015 that they

12    didn't have knowledge.

13         But, remember, what the inventor said, when I

14    disclosed it to those people, I disclosed the application,

15    but it was fully published and fully public.

16         So it's a true statement that the patent didn't

17    issue, but in March of 2012, these folks knew exactly what

18    the '022 patent said.

19         Now, you know how we also know, look at that

20    diagram, look at the diagram that's in the patent and the

21    diagram that's in their product development plan, in their

22    kickoff meeting.

23         The boat is the same, the cross hatching is the

24    same, every bit of it is the same.  They want you, I guess,

25    to believe that that's just a coincidence.

1          Last, and I'll put this on the screen.  You

2   remember Mr. Krull testified, the director at Garmin, and --

3   and I asked him -- pull that down a bit -- I said to him:

4   Mr. Krull, I'm trying to figure out whether or not Garmin

5   takes this lawsuit seriously.

6          And I said:  As a director of Garmin, sir, isn't it

7   true that you have done absolutely nothing to even determine

8   whether or not Garmin infringes these patents?

9          And he said:  That's correct.

10          So I ask you, when the Court says are they

11   proceeding without any regard for others' rights, are they

12   proceeding in bad faith?  The director of Garmin says, we --

13   I haven't even taken a look to try to determine whether or

14   not we're taking these people's property rights.

15          So when they say to you and the Court says to you

16   that willfulness is reserved for cases where folks act in

17   bad faith and without regard to other's rights, I'd suggest

18   to you that this is the case.  The evidence absolutely

19   suggests that this is the case.

20          Now, the third questions you're going to be asked

21   is whether or not they proved that the '022 and the '168

22   patents are invalid.  I don't need to belabor the point.

23          They have never, from the beginning of this trial

24   until now, walked you through, as the Court has instructed

25   you, please look at those instructions, the Court says you

```
 1   have to go claim-by-claim, word-by-word, to show that

 2   someone else has invented this before you did.

 3          Garmin's lawyer says they're in the real world.  I

 4   have no idea what that means.  But the real world here is

 5   they've not met their burden of proof, not even close.

 6          Now, the final question the Court is going to ask

 7   you, if you, in fact, find there's infringement, do you find

 8   that they did not meet their burden of proof with respect to

 9   invalidity, is what sum of money should be paid to Navico

10   for the infringement.  The total amount of that money is

11   $38,754,934.

12          THE COURT:  You have two minutes remaining.

13          MR. DACUS:  Thank you, Your Honor.

14          Now, there's some questions on here that I want you

15   to understand.  The Court's going to ask you whether or not

16   that should be in a lump sum for the royalty part or a

17   running royalty.

18          No one has even talked to you about a lump sum.

19   What a running royalty means is should they pay for each

20   unit they sell.  And, of course, that makes sense.  If they

21   don't sell any, they shouldn't pay.  If they do sell some,

22   they should pay.  So -- and they haven't even contested they

23   should pay on a running royalty basis.

24          In addition to that, the Court's going to ask you

25   about lost profits.  Lost profits are $29,650,382.
```

1       Now, there's an "or" on that -- on that royalty,

2   and let me tell you why.  If for some reason you were to

3   find that there's no lost profits, then the total royalty

4   you should award is $18,318,860.  That's if you award no

5   lost profits.  But if you award lost profits, then we're

6   only entitled to a smaller royalty, $9,104,552.

7       I'm going to end where I started last Thursday, and

8   that is to say a very sincere thanks.  I know oftentimes

9   this is like drinking water through a fire hose.  There's a

10  lot of information that you've received in the -- in the

11  last three-and-a-half days.

12      People at Navico, and I know Mr. Sprouse, would not

13  be happy with me if I didn't say to you before you retire

14  that they appreciate very much your time.  And I appreciate

15  very much your time.

16      Thank you, Your Honor.

17      THE COURT:  All right.  Ladies and gentlemen, I'd

18  now like to provide you with a few final instruction before

19  you begin your deliberations.

20      You must perform your duty as jurors without bias

21  or prejudice as to either party.  The law does not permit

22  you to be controlled by sympathy, prejudice, or public

23  opinion.

24      All parties expect that you will carefully and

25  impartially consider all the evidence, follow the law as I

1  have given it to you, and reach a just verdict, regardless

2  of the consequences.

3          Answer the questions in the verdict form based on

4  the facts as you find them to be in this case, following the

5  instructions that the Court has given you.

6          Do not decide who you think should win and then

7  answer the questions accordingly.  Again, your answers and

8  your verdict must be unanimous.

9          You should consider and decide this case as a

10  dispute between persons of equal standing in the community,

11  of equal worth, and holding the same or similar stations in

12  life.  This is true in patent cases between corporations,

13  partnerships, or individuals.

14          A patent owner is entitled to protect its rights

15  under the U.S. Constitution.  This includes bringing a suit

16  in a United States District Court for money damages for

17  infringement.

18          The law recognizes no distinction among types of

19  parties.  All corporations, partnerships, or other

20  organizations stand equal before the law, regardless of

21  their size or who owns them, and they are to be treated as

22  equals.

23          When you retire to the jury room to deliberate on

24  your verdict, you'll each have a copy of these final jury

25  instructions, the Court's charge to the jury, to take with

1    you.

2            If you desire to review any of the exhibits which

3    the Court has admitted into evidence during the course of

4    the trial, you should advise me by a written note delivered

5    to the Court Security Officer.  I will -- I will then send

6    that exhibit or those exhibits to you.

7            Once you retire, you should -- you should select

8    your foreperson and then conduct your deliberations.  If you

9    recess during your deliberations, follow all the

10   instructions the Court has given you about your conduct

11   during the trial.

12           After you have reached your verdict, your

13   foreperson is to fill in on the verdict form your unanimous

14   answers to those questions, sign it, and then date it.

15           Do not reveal your answers until such time as you

16   are discharged, unless otherwise directed by me.  And you

17   must never disclose to anyone, not even to me, your

18   numerical division on any question.

19           Any notes that you've taken during the course of

20   the trial are aids to your memory only.  If your memory

21   should differ from your notes, then you should rely on your

22   memory and not your notes.  The notes are not evidence.

23           A juror who has not taken notes should rely on his

24   or her own independent recollection of the evidence and

25   should not be unduly influenced by the notes of other

1    jurors.  Notes are not entitled to any greater weight than

2    the recollection or impression that each juror has about the

3    testimony.

4         If you want to communicate with me at any time

5    during your deliberations, give a written message or a

6    question to the Court Security Officer who will then bring

7    it to me.  I will then respond as promptly as possible

8    either in writing or by having you brought back into the

9    courtroom where I can address you orally.

10        I will always first disclose to the attorneys in

11   the case your question or message and my response before I

12   respond to any note received from you.

13        After you've reached a verdict and I have

14   discharged you from your duty as jurors, you are not

15   required to talk with anyone about this case unless the

16   Court orders otherwise.

17        I'll now hand to the Court Security Officer eight

18   copies of the final jury instructions and one clean copy of

19   the verdict form to deliver to the jury in the jury room.

20        Ladies and gentlemen of the jury, you may now

21   retire to begin your deliberations.  We await your verdict.

22        COURT SECURITY OFFICER:  All rise for the jury.

23        (Jury out.)

24        THE COURT:  Be seated, please.

25        Counsel, you are more than welcome to wait here in

1  the courtroom or here at the courthouse.  You're also free

2  to wait off the premises if you would prefer that.

3          If you elect not to wait here at the court

4  facility, then you should make sure before you leave that we

5  have a good, working, answering cell phone number to call

6  your team if we should get a note or get a verdict, so that

7  you can get back here quickly.  Make sure you do that if you

8  elect to wait elsewhere.

9          Otherwise, pending either a note from the jury or

10  the return of a verdict, we stand in recess.

11          COURT SECURITY OFFICER:  All rise.

12          (Recess.)

13          (Jury out.)

14          COURT SECURITY OFFICER:  All rise.

15          THE COURT:  Be seated, please.

16          All right.  Counsel, I've received the following

17  written message from the jury:

18          Your Honor, we have reached a verdict.

19          Signed by Ms. Cooper as foreperson.  And she should

20  be Juror No. 2.

21          I'll mark this note as Item 1 for identification

22  and deliver it to the courtroom deputy.

23          And we'll bring in the jury.

24          COURT SECURITY OFFICER:  All rise for the jury.

25          (Jury in -- 2:04 p.m.)

1          THE COURT:  Please be seated.

2          Ms. Cooper, I understand you're the foreperson of

3   the jury; is that correct?

4          THE FOREPERSON:  Yes, Your Honor.

5          THE COURT:  Has the jury reached a verdict?

6          THE FOREPERSON:  Yes, they have, Your Honor.

7          THE COURT:  Would you hand the signed and dated

8   verdict form to the Court Security Officer, who will bring

9   it to me?

10         THE FOREPERSON:  Yes, Your Honor.

11         THE COURT:  Ladies and gentlemen, I'm going to

12  announce the verdict at this time, and I'm going to ask each

13  member of the jury to listen very carefully because after I

14  have announced the verdict into the record, I'm going to ask

15  each of you if this is your verdict so that we can confirm

16  that it is, in fact, the unanimous verdict of all eight

17  members of the jury.

18         Turning to the verdict form, and turning to the

19  second page, wherein Question 1 is located.

20         Question 1:  Did Navico prove by a preponderance of

21  the evidence that Garmin has directly or indirectly

22  infringed any of the asserted claims of either the '168

23  patent or the '022 patent?

24         The answer is:  Yes.

25         Turning to the next page, wherein Question 2 is

1    found.

2        Did Navico prove by a preponderance of the evidence

3    that Garmin's infringement was willful?

4        The answer is:  Yes.

5        Turning to the next page, wherein Question 3 is

6    found.

7        Did Garmin prove by clear and convincing evidence

8    that any of the following claims of the following patents

9    are invalid?

10        For the '022 patent, each listed claim is answered:

11   No.

12        For the '168 patent, each listed claim is answered:

13   No.

14        Turning to the next page, wherein Question 4 is

15   located.

16        What sum of money, if now paid in cash, do you find

17   by a preponderance of the evidence would reasonably

18   compensate Navico for Garmin's infringement?

19        The answer:  $38,755,000.00.

20        Below that, the Court asked for a breakdown of that

21   number by the jury.

22        Was any portion of this either a lump sum or a

23   running royalty?

24        The jury has indicated that of that total award,

25   $9,105,000.00 is a running royalty.

1    No amount is a lump sum.

2    The remainder of the award being $29,650,000.00 is

3  shown as an award of lost profits.

4    Turning to the last page of the verdict form, I

5  find that it is signed by Ms. Cooper as the jury foreperson,

6  and it is dated with today's date of September the 8th,

7  2017.

8    Ladies and gentlemen, let me poll you at this time

9  to make sure that this, in fact, is the unanimous verdict of

10 the entire eight members of our jury.

11    If this is your verdict as I have read it, would

12 you please stand?

13    (Jury polled.)

14    Thank you.  Please have a seat.

15    Let the record reflect that all eight members of

16 the jury immediately rose and stood in response to the

17 Court's question to poll the jury, and have confirmed that

18 this is the unanimous verdict of all eight members of the

19 jury.

20    Ladies and gentlemen, this now completes the trial

21 of this case.  From the very beginning, while you were

22 selected as jurors before you ever heard the first evidence,

23 I have instructed you over and over again not to discuss the

24 case with anyone and not to discuss the case among

25 yourselves until you had heard all the evidence.

1            I'm now releasing you from those obligations.  You

2    are free to talk about this case with your friends, your

3    family, or anybody of your choosing.

4            You are also, by the same token, not required to

5    discuss your service as jurors or your impressions about

6    this trial or this case with anyone.  That decision is yours

7    and yours alone.  You are free to discuss it in any way

8    you'd like to.  You are under no obligation to discuss it

9    with anyone.

10           I also want you to know that it's the custom and

11   practice in this court that if the members of the jury want

12   to discuss the case with the lawyers, who I can assure you

13   whether they're on the winning side or the losing side,

14   they're interested in your views.

15           If any of you wish to discuss the case with any of

16   the lawyers, as you get ready to leave the courthouse, I

17   suspect they will probably be positioned on the sidewalk to

18   where they're readily accessible to you.

19           If you want to talk about your service as jurors,

20   stop and have a conversation.  They will not initiate a

21   conversation with you.  You must initiate a conversation

22   with them.

23           If you would, on the other hand, prefer not to talk

24   about it with them, simply don't initiate a conversation and

25   walk right by and go about your business.  The decision is

1    yours.  It is not theirs.

2            They will not initiate a discussion with you, but

3    they will be more than ready to carry on a conversation if

4    you decide to initiate that conversation with them.

5            That's the custom and practice of this Court.  I

6    used to stand out on those front steps and wait for jurors

7    to walk by.  I know they are interested in your views and

8    comments, but you will have to initiate any conversation.

9    That's not up to them.  That's up to you.

10           But you are released from your instructions not to

11   discuss the case among yourselves or with anyone else.  That

12   is -- that is behind us at this point.

13           Also, ladies and gentlemen, I want you to

14   understand how very, very much the Court appreciates and

15   values your service as the members of the jury in this case.

16           The Court could simply not function as we're

17   required to do under the constitution without ordinary

18   Americans like yourselves appearing for jury duty, and when

19   being selected, staying and serving, being punctual as each

20   of you have been, being attentive as each of you have been,

21   and doing your duty to respond to the Court's instructions

22   and return a verdict like you have done in this case.

23           I've watched you throughout the trial.  You have

24   been attentive every moment that the Court's been in

25   session.

1      I cannot say enough positive things about the way

2  you have discharged your responsibilities.  You have each

3  rendered very value public service.

4      Every one of you had other important things to do

5  this week.  Every one of you sacrificed to be here and to

6  serve.  And that is not lost on the Court, and I assure you

7  it's not lost on anyone else in this courtroom.  And I think

8  you deserve our thanks and a clear and unequivocal --

9  unequivocal expression of the Court's appreciation.

10      I would like to ask one personal favor of you.

11  It's been my practice since I've been on the bench when a

12  verdict has been returned and the jury has been discharged

13  to ask them if rather than immediately getting up and

14  leaving, you would return to the jury room for just a couple

15  minutes and allow me to come in; and I'd like the privilege

16  to shake each one of your hands.  I'd like the privilege to

17  thank you face-to-face for what you've done.  I think what

18  you've done is important enough and significant enough to

19  warrant that.

20      You're not required to do that.  You are now

21  discharged as jurors.  You may leave if you like.  But I

22  promise not to hold you more than a few minutes; but if you

23  would do me that personal privilege, I'd like the honor of

24  coming in and thanking you in person face-to-face because I

25  quite honestly believe each of you deserve that.

1          Otherwise, ladies and gentlemen, that completes the

2     trial of this case.  If you would do me that honor, I will

3     meet you in the jury room in just a few minutes.

4          COURT SECURITY OFFICER:  All rise for the jury.

5          (Jury out.)

6          THE COURT:  Counsel, that completes the trial of

7     this case.  The Court accepts the verdict, delivers it to

8     the court -- courtroom deputy, and you are excused.

9          COURT SECURITY OFFICER:  All rise.

10         (Court adjourned.)

11

12

13

14                         CERTIFICATION

15

16              I HEREBY CERTIFY that the foregoing is a

17    true and correct transcript from the stenographic notes of

18    the proceedings in the above-entitled matter to the best of

19    my ability.

20
      /s/ Shelly Holmes
21    SHELLY HOLMES, CSR, TCRR                September 8, 2017
      Official Court Reporter
22    State of Texas No.:  7804
      Expiration Date  12/31/18
23

24

25